Melvin State Bank, an Illinois Banking Corporation, Plaintiff-Appellee, v. Merwin E. Crowe and Alice Wisthuff and Frederick Drake, Defendants, Merwin E. Crowe, Defendant-Appellant.

Melvin State Bank, an Illinois Banking Corporation, Plaintiff-Appellee, v. Merwin E. Crowe and Alice Wisthuff and Frederick Drake, Defendants, Alice Wisthuff, Defendant-Appellant.

Gen. Nos. 10,906, 10,913. (Consolidated.)

Fourth District.

August 8, 1968.

Hagin Harper, of Champaign (Kenneth E. Baughman, of counsel), and Fellheimer & Vicars and Walter L. Stodd, of Pontiac, for appellant.

Martensen & Martensen, of Paxton, for appellee.

TRAPP, J.

Alice Wisthuff appeals from the several judgments entered, after jury verdicts, as follows: (1) the sum of $16,923.75 in favor of the Melvin State Bank (hereinafter called Bank), and against Merwin E. Crowe and Alice Wisthuff on a judgment note for $15,000, dated January 23, 1964; (2) against Alice Wisthuff, as counterplaintiff, and in favor of the Bank as counterdefendant, on a counterclaim for $10,000 and (3) against Alice Wisthuff, as plaintiff, and in favor of Frederick Drake, as defendant, on the former's third-party complaint for damages and punitive damages totaling $45,000.

Merwin E. Crowe, a third-party defendant, appeals a judgment, after jury verdict, in favor of Alice Wisthuff, third-party plaintiff, in the sum of $15,000.

Third-party defendant, Merwin E. Crowe, contends that he is entitled to judgment in his favor notwithstanding the verdict, and in the alternative that he is entitled to a new trial because of improper instructions and the introduction of improper evidence.

While one of the briefs designates Drake as an appellee, no brief appears to have been filed on his behalf.

A general statement of the relation of the parties is necessary to an understanding of their contentions, and the detailed evidence which tends to support the various contentions.

Crowe operated a business under the corporate name of Meca Magnetics and, over a period of time, had become increasingly indebted to the Melvin State Bank upon unsecured loans until, at the time of the pertinent transactions in November of 1963, he was indebted to the Bank in the sum of $19,580.26. Frederick D. Drake was executive vice president and cashier and, for practical purposes, the day-to-day managing officer of the Melvin State Bank. Alice Wisthuff, who had been a part-time employee of Crowe, was sent by Crowe to Drake to obtain information regarding Crowe's business preliminary to

84

having her make a loan to, or an investment in the business. After consulting with Drake, Alice Wisthuff first brought $10,366.38 to Drake at the Bank. At some time she received a note for $10,000, payable in five years, signed by Crowe and his wife. Of Mrs. Wisthuff's money, $4,580.26 was applied to Crowe's bank loan, and the balance was credited to his checking account. About one month after the first transaction Crowe signed a thirty-day note at the Bank for the $15,000 balance he owed the Bank. Four or five days later Drake came to Crowe's Meca Magnetics factory, where Alice Wisthuff was again employed, and obtained her signature on the Crowe $15,000 note, and apparently on other papers. On January 23, 1964, the thirty-day note having matured, Crowe obtained Mrs. Wisthuff's signature on his sixty-day renewal note of $15,000 in favor of the Bank.

The Bank took judgment on the latter note on January 23, 1964. Alice Wisthuff caused the judgment to be opened and answered the complaint denying the consideration, and alleging fraudulent representation by the Bank's agent as to the paper she was signing. She also counterclaimed for $10,000, alleging that the Bank's agent represented that Meca Magnetics had a net worth of $89,000, when its net worth was nil. She filed a third-party complaint against Merwin E. Crowe, her employer, and Frederick D. Drake, as agent of the Bank, alleging fraudulent representation, and the breach of a fiduciary relation.

The record discloses a fundamental confusion in the different principles of law applied in the several aspects of the case. Thus, the investment of $10,366.80 by Alice Wisthuff in Meca Magnetics presents one aspect of the case as to the fraudulent representation alleged, and as to the question of the scope of authority of Drake as executive, vice president and agent of the Bank, whereas the obtaining of the signature of Alice Wisthuff on the $15,000 note of December 17, 1963, first executed

by Crowe and the substitution therefor of the $15,000 note of January 23, 1964, presents an entirely different aspect of the case. It is noted, by way of illustration, that plaintiff's given Instruction No. 19 states that one of the questions for the jury is whether Drake was acting within the scope of his authority. No distinction is made as to the two aspects of the case. It is obvious, however, that two different transactions are involved,—obtaining the $10,366.38 of Alice Wisthuff's money on November 14, 1963, and obtaining Alice Wisthuff's signature on Crowe's previously executed note to the Bank of December 17, 1963, on December 23, 1963. There may well have been a question concerning Drake's authority to recommend an investment as agent of the Bank. There is no question whatever that Drake was acting within the scope of his authority when he attempted to obtain additional security on a note of a Bank customer which was of doubtful value. It is noted that plaintiff's given Instruction No. 24 refers to the scope of the authority of Drake "at the time of the occurrence." As stated, there were at least two different occurrences, and there were alleged misrepresentations of an entirely different nature on the two occasions.

Again, the personal liability of Drake, by reason of using his position in the Bank to carry out directions of Crowe in giving information to Alice Wisthuff, is entirely separate and apart from the liability of the Bank. Even in respect to obtaining Alice Wisthuff's signature on the Crowe note to the Bank, Drake's responsibility for false representation may be separate and apart from the liability of the Bank in respect to this transaction. This would be clearly illustrated if the Bank had negotiated the note.

Finally, if the issue of confidential relationship were resolved by the jury in favor of Alice Wisthuff, the consequences concerning the burden of proof would be entirely different, and the numerous instructions regarding the

86

requirements for proof of fraud and deceit set forth in nine of plaintiff's given instructions would be entirely inapplicable.

The specific failure to give proper instructions complained of by Alice Wisthuff is the failure to instruct upon the effect of a confidential relationship, if found. Further specific complaint is made that there is no evidence to support the judgment against Alice Wisthuff, and that the other judgments and verdicts adverse to her are against the manifest weight of the evidence. A review of the evidence is therefore necessary.

Alice Wisthuff's age is not set forth. She was married to a man 87 years old who was ill and did not participate in the transaction. She and her husband had farmed near Melvin, Illinois, and then moved to Gibson City in 1940. She and her husband had done some banking at the Melvin State Bank when they were farming near Melvin. She had an eighth-grade education. She worked from time to time to help out with family finances. At first she worked in a canning factory. She worked in a sewing factory for a while. Later she worked for James Electronics, which became Meca Magnetics. She worked as a bobbin winder. She had known Crowe when he was a salesman for James Electronics.

She had worked at Meca Magnetics in the Spring of 1963, but was not working there in November of 1963. She was taking care of her husband, who was ill. In none of her employment had Alice Wisthuff done any bookwork or office work. She was not familiar with financial arrangements. The Wisthuff's adopted son had died and she had collected something over $10,000 in insurance, which she had placed in savings and loan associations.

On November 13, 1963, Alice Wisthuff received a telephone call from Crowe, who asked her to come to his office, and she did. She testified that Crowe told her the Bank had talked him into selling some shares in the company. He asked her to go to the Bank that afternoon,

and said that he gave the Bank permission to show her his records. She went to the Bank about 2 o'clock that afternoon. She testified that Frederick Drake showed her a bank statement and said how much it had gained in the past; that he showed her a paper and said the company was worth $89,000, that it would be a good investment for her, and she would get six percent on her money. She testified that she told Drake that she had some insurance money from her son's death, that she didn't want to lose it and she wanted a straight deal. She said Drake asked her if she could have the money the next day.

On November 14, 1963, Mrs. Wisthuff returned to the Bank with two building and loan checks—one for $5,000 and one for $5,366.38. She endorsed the checks in blank. She states that she received papers from Drake, who said she would have part ownership in the factory. The papers included a stock certificate of Meca Magnetics, Inc., for 1,000 shares of $10 par value stock in the name of Merwin E. Crowe, which was dated October 30, 1962, and was not endorsed; a blank stock assignment separate from the certificate signed by Crowe, undated and with no stock named therein; and a memorandum concerning Meca Magnetics, Inc., to Fred Drake from Merwin E. Crowe under date of November 12, 1962, as follows:

"The attached stock certificate #4 for 1,000 shares (par value $10.00 ea.) to Merwin E. Crowe; is hereby to be used to secure a 'loan' to provide additional capital for Meca Magnetics, Inc./This in no way transfers title of this stock certificate No. 4. . . ."

A fourth document delivered was a judgment note for $10,000, dated November 14, 1963, payable to the order of Alice Wisthuff with interest at 6% per annum due five years after date, signed by Crowe. The note contained this clause:

"Interest payable semi annually with $2,000.00 payment privilege each anniversary date of note.

88

Payment need not be made if maker prefers not to make it until due date of note."

Alice Wisthuff testified that she did not read the papers.

The several documents which Alice Wisthuff received had apparently been in Crowe's file at the Bank for a year. The file also contained some financial statements headed Meca Magnetics, Inc. One statement purported to show a net profit of $14,334.46 for an eight-month period ending May 31, 1963. Another purported to show a net worth as of June 11, 1962, of $15,781.49. Another purported to show a net worth of $60,729.90 as of December 31, 1962. Another statement, dated September 30, 1963, showed a net worth of $49,692.03.

Frederick D. Drake was executive vice president of the Melvin State Bank from 1959 until February 8, 1964. Leroy P. Arends was president of the Bank, but did not spend regular hours there. He would frequent the Bank at his leisure. As far as day-to-day operation was concerned, Drake was the manager in charge. Drake had a Ph.D. from Wesleyan and a Master of Education from Illinois State University. He was a bank examiner for the State of Illinois from 1955 to 1959. He was familiar with Crowe's business to the extent that he was in the place of business five to ten times prior to November 13, 1963. On some occasion prior to November, 1963, Drake had gone to Chicago with Crowe to consult the Small Business Administration about a loan. He states that he doesn't know whether Crowe ever got the Small Business Administration loan. He recalls that they did take some financial statements to Chicago.

Nothing short of a detailed chronological review of Drake's testimony can put the transactions in the proper perspective.

Drake testified that on November 13, 1963, Crowe called him and said that an employee was coming down to talk to him concerning Crowe's borrowing. Crowe told

89

Drake to disclose to her anything she desired concerning the operation and asked Drake to make an open book of Crowe's operation. When asked if he could recall the discussion with Alice Wisthuff in the back room of the Bank in particular, he said: "I showed her Mr. Crowe's file just as you showed it to the jury a little bit ago." He also said, "I handed them to her similar to the way they were handed to the people in the jury box. I handed her the file and she could go through it and look at anything she wished because Mr. Crowe told me to allow her to do this." (Abst. p 2.)

Drake was asked if he had known Mrs. Wisthuff before he saw her that day in the Bank and states: "I had never seen her or heard of her." He was asked whether he could recall the discussion that took place with Mrs. Wisthuff, and he replied, "Not in particular." He was asked:

"Q. Did you give her any information whatsoever concerning Mr. Crowe's assets or his accounts?", and he replied:

"A. I showed her Mr. Crowe's file just as you showed it to the jury a little bit ago."

He was asked:

"Q. Here is Exhibit No. 2 of Mrs. Wisthuff's, this one here is without signature. (financial statement.) Did you show this to Mrs. Wisthuff and point out any figures to her on this instrument?", and he answered:

"A. I showed her the complete file and if it was in the file at that time she saw it."

He was asked:

"Q. I am asking for the details and facts of what you did in detail?", and he answered:

"A. I handed her the Gibson Meca Magnetics file which was Merwin Crowe's business in the bank and said this was all of the information Melvin State Bank had on Mr. Crowe at that time, and I also

90

would have told her at that time any indebtedness he would have had I would have told her."

He was asked:

"Q. Did you show her any notes or papers other than what we have here today?", and he answered:

"A. I don't remember showing her any papers other than what Mr. Crowe had in the file."

He was then asked:

"Q. And in this period of time—in other words, I am summarizing from what I understand from you. If I am wrong, tell me. There was a brief introduction, she came in and sat down and she didn't ask you anything, you simply got the file, laid it in front of her and she got up and left?"

His answer was:

"A. I don't think the introduction was quite that briefly done because I attempted to be friendly with a person coming in the bank, especially one I didn't know, and we spent some time on general conversation before we even started to discuss Meca Magnetics in any way, and when she did discuss Meca Magnetics with me it was at that time I got the file and I said 'This is the information you are going to need.' "

Drake stated that he did not know what he told Mrs. Wisthuff on November 13, 1963, that might cause her to get the $10,366.38 out of her building and loan account and bring it to the Bank on November 14, 1963. When Mrs. Wisthuff brought the money in on November 14, 1963, Drake believes he may have given her the stock certificate, blank assignment and memorandum hereinbefore described. On that day he says that he explained to her that he had gained some notoriety from the Bloomington Pantagraph when a customer of the bank claimed he had defrauded him, and he didn't want this to happen again, and there was a great deal of similarity and he

91

wanted her to sign the paper which he then obtained. The paper on Melvin State Bank stationery is, undated, as follows:

"To Whom It May Concern:
"I, Alice Wisthuff, of my own free will and accord did on November 14, 1963, loan to Merwin E. Crowe ten thousand dollars $10,000, taking as collateral Meca Magnetic, Incorporated stock, and do not hold the Melvin State Bank or any of its officers responsible for this transaction."

Two women employees of the Bank signed as witnesses.

On the separate subject of Crowe's status with the Bank at the time of the first two meetings between Drake and Alice Wisthuff, Drake was asked in the original examination:

"Q. Had you investigated his wealth to know what he had; what it was worth?", and he answered:
"A. I was satisfied."
He also said:
"A. I had made the loan to Merwin Crowe and I thought the loan was worth—that he was worth financially enough to bear the burden of the loan.", and:
"A. I based it on Merwin Crowe, his statement, any figures he might have brought in the bank."

Drake was asked to check the minutes of the Board of Directors to see whether any mention had been made of Crowe's defaulted note. He found no record in the minutes. He was asked:

"Q. You have already said in the board meeting you did talk about this account though?"
He answered:
"A. I am not sure I said we talked about him. I don't remember that I said we talked about him.

92

I am positive that we must have talked about every note that was ever made in the bank."

Up to this point, Drake who had never previously seen Mrs. Wisthuff, met her one afternoon after a phone call from her employer in the morning and met her the next day to receive the money she brought in, but had no particular recollection of any conversation about Crowe's bank debt in reference to which he was satisfied. However, he gave the following testimony:

"A. There may have been one article of conversation that hasn't been mentioned. When I told the directors of Mrs. Wisthuff and her coming into the bank, one of the directors said he thought she possibly could be related to him, and I may have asked her this that day because I was curious of the relationship and I didn't know what came of it."

Drake's testimony then abruptly turns into an account of a transaction that was not at first mentioned in his testimony. He had testified that he simply handed the file to Mrs. Wisthuff for examination to see whether she would make an investment, that he was thoroughly satisfied with Crowe's ability to pay, that there had been no particular conversation with the bank directors about the status of the Crowe loan, that he had carefully taken a release only as to an investment to be made by Mrs. Wisthuff, and that he remembered only one item of conversation that had not been mentioned. Drake then said:

"We had taken at the time Mrs. Wisthuff had come into the bank a financial statement from her telling us of her value; her net worth. She listed the assets she had and we accepted that as her statement *because we asked her to sign a guarantee agreement she would support Merwin Crowe's note at the bank and she signed the guarantee agreement.*

93

When the directors at the bank were informed at an informal meeting the president of the bank reminded me that the Federal Deposit Insurance deposit examiner, Mr. Chuck Lee, did not particularly appreciate the signing of guarantee agreements and there was no difference in signing a guarantee agreement in my opinion other than the difficulty of often convincing the bank examiner of this being a difficulty so I said I didn't think it makes any difference. I said that to Mr. Lee and also to Mr. Arends, but since Mr. Lee thought it would be better if we had people co-sign notes, to put their name on the note, I then at that time took the note in the Melvin State Bank of Merwin Crowe down to the Meca Magnetics shop where Mrs. Wisthuff and Mr. Crowe were working, and we waited until after the business hours of the shop were closed and we were there by ourselves and I asked her at that time to write her name on the note itself *telling her that she had already signed the guarantee agreement and that it was in sum and substance the same thing and she signed the note."* (Emphasis supplied.)

The foregoing suggests the first recognition by the witness of two facts, to wit: That there is no real connection between Mrs. Wisthuff's making an investment of $10,366.38, and signing a note for $15,000 to the Bank, and that at the risk of blowing out of the water the previous testimony of no concern about Crowe's financial status, some explanation was going to have to be given for signing the thirty-day judgment note for $15,000. Thus, it was necessary to reconstruct the interview when he first met Alice Wisthuff to cover two subjects instead of one—that is, investment and loan guarantee instead of just investment.

The testimony of certain directors which follows immediately in the trial may perhaps explain the abandon-

94

ment of the stand of complete satisfaction with Crowe's ability to pay the loan. George Dodd, a director of the Bank, testified that Crowe's account was discussed by the Board in the fall of 1963. He said, "We was a little leary of the note being paid. He hadn't been paying." He said it was discussed at more than one Board meeting. The Board, more or less, left it up to Fred Drake and Jim Arnold what was to be done. Carl Weber, a director, testified that the Board wanted more security on the note, and Fred Drake was asked to get more security on the note.

Just as Drake's statement that he was satisfied that Crowe could pay the loan, and his statement that there was no special attention given by the Board to the Crowe note was totally contradicted by the testimony of Board members, so was his statement that Alice Wisthuff had signed a loan guarantee agreement previous to his obtaining her signature on the note totally contradicted by documentary evidence.

The next time that Drake saw Alice Wisthuff after he took her money for the loan to Crowe, on November 14, 1963, was on December 23, 1963, when he went out to the factory of Meca Magnetics, after business hours, and saw her, first with Crowe and then alone. The only loan guarantee agreement Alice Wisthuff signed was on December 23, 1963, on the same occasion when Drake obtained her cosignature on the note.

Mrs. Wisthuff says that Drake did not tell her she was signing a note on December 23, 1963, but some papers necessary to transfer Meca Magnetics account to a Chicago Bank. Drake says he told her to sign the note because she was already obligated on a guarantee agreement, which was not true, and he had to know it was not true. On this occasion Drake, in attempting to get additional security on the Bank note, was acting as the Bank's agent, as a matter of law.

95

It thus appears that there was no consideration for Mrs. Wisthuff to cosign the December 17, 1963, note of Crowe for $15,000 in favor of the Melvin State Bank. There are only two versions of this transaction. If Mrs. Wisthuff's version were true there would be fraud in the execution of a note which was palmed off as a different kind of transaction. If Drake represented to her that she must sign because she was already obligated by signed loan guarantee, this was a fraudulent representation which would invalidate her signature for the reason that he was acting as agent of the Bank in obtaining this signature for additional security.

Even if Mrs. Wisthuff had made some oral statement that she would back up Crowe's obligation, this would be an unenforceable promise, both by reason of the Statute of Frauds and the indefinite nature of the statement. It is conceded that the Bank had already extended the thirty-day credit to Crowe on December 17, 1963, when he signed the note. No new detriment or change of position was taken by the Bank as a result of adding Alice Wisthuff's signature.

The Bank's position that only fraud in the execution and not fraud in the inducement will avoid an instrument where a person has a full opportunity to read the instrument is not tenable here. First, it is a complete answer that a false representation as to a nonexistent prior obligation will not create such an obligation and thus supply a consideration. Second, such a false representation by an experienced banker, possibly in the presence of an employer, is calculated to disarm an inexperienced person. Third, it affirmatively appears that the judgment note was not explained to Alice Wisthuff. Fourth, it is obvious that she did not understand the matter of the guarantee agreement because she signed it on an occasion when the banker told her she had already signed it. The note of January 23, 1964, was simply a renewal of the December 17, 1963 note, and stands upon the same footing.

Upon such premises, Plaintiff's Instruction No. 8 with regard to extension of credit as consideration is inapplicable for the reason that the credit had already been extended in exact terms when she was asked to sign.

■ The judgment in favor of the Melvin State Bank against Alice Wisthuff in the sum of $16,923.75 must be reversed for the reason that the Bank failed to prove consideration for the cosignature.

■ We arrive at the issues on Alice Wisthuff's counterclaim against the Bank, and her third-party complaint against Merwin E. Crowe and Frederick D. Drake. Under the facts hereinbefore recited, we note the fact that Alice Wisthuff was sent by her employer, Crowe, to get correct information regarding the soundness of an investment from an agent of the Bank, and we consider that the agent of the Bank agreed to participate in furnishing this information. It is apparent that the Bank itself stood to gain by reducing a bad loan by reason of the "investment," if made, and, considering the educational background of the respective parties, we find there was evidence from which the jury could have found that Crowe and Drake, individually and in concert, occupied a confidential relationship to Alice Wisthuff. In re Estate of Bichl, 65 Ill App2d 3, 213 NE2d 83; McCartney v. McCartney, 8 Ill2d 494, 134 NE2d 789; Oster v. Oster, 414 Ill 470, 111 NE2d 319; Stephenson v. Kulichek, 410 Ill 139, 101 NE2d 542. In Lipscomb v. Allen, 298 Ill 537 on p 544, 132 NE 206, the Supreme Court of Illinois quoted the following with approval:

> " 'The term fiduciary or confidential relation, as used in this connection, is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused,—in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces

97

both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. The only question is, does such a relation in fact exist?' (Mayrand v. Mayrand, 194 Ill 45.). 'It is settled by the overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal. It may be moral, social, domestic or merely personal.' (2 Pomeroy's Eq Jur—3d ed— sec 956.)"

■■ The court gave an instruction stating what might constitute a fiduciary relationship, but gave no instruction as to the effect of a fiduciary or confidential relationship if found to exist. Where the confidential relationship is shown to exist, the burden of proving good faith and proving a free and frank disclosure of all relevant information, and that consideration for the transaction is adequate, is imposed upon the person or persons in whom the confidence or trust is reposed. In re Estate of Bichl, 65 Ill App2d 3, 213 NE2d 83. We believe that Mrs. Wisthuff's tendered Instruction No. 4 fairly presented this principle and that the jury should have had an instruction, or instructions, stating the legal results that would follow if a confidential relationship were found. Certainly if a confidential relationship were found to exist, the strict principles applicable to proof of fraud and deceit, as exemplified in plaintiff's given instructions on the elements and proof of fraud, would not apply. A person who abuses a confidential relation is liable for the consequences of that abuse.

■ The Bank contends that this Court is conclusively bound by the finding of the jury to a special interrogatory, the giving of which was not objected to nor raised as an issue at the post-trial motion:

"Did Frederick Drake make to Alice Wisthuff false and fraudulent representations as defined in and by the instructions of this Court?"

The jury answered the interrogatory in the negative.

This interrogatory presents obvious difficulties in its cross reference to the body of the instructions and its lack of specificity. The evidence raised separate issues as to representations made concerning the stock transaction and concerning the signing of the note. There is evidence under distinctly pleaded theories of fraud and fiduciary relation. Plaintiff's set of given instructions relating to fraudulent representations directed the attention of the jury only to the stock transaction. Under such circumstances the finding is not substantially conclusive of all the facts upon which the issue of liability depends. Forslund v. Chicago Transit Authority, 9 Ill App2d 290, 132 NE2d 801.

Perhaps, more significant is that the answer to the interrogatory is incorrect. By his own statement Drake told Alice Wisthuff that she might as well sign the judgment because she had previously signed a loan guarantee agreement for Crowe's bank obligations. This was false. This Court is bound to give great weight to a jury's finding on a proper interrogatory, but it is not bound to find contrary to an admitted fact. The only other version of this incident is that of Alice Wisthuff, and this would not help the Bank. Additionally, neither version would supply a consideration that is, in fact, absent.

The judgment in favor of Drake on Alice Wisthuff's third-party complaint must be reversed and remanded for error in refusing instructions offered by the third-party plaintiff.

██ The counterdefendant Bank contends that it cannot be responsible for acts of Drake in representing that the investment of $10,366.38 was a good investment, even if he so represented it knowing it to be false, for the reason that such representations would be outside the

scope of his authority as an agent of the Bank. While this principle may be correct as to a part of the investment, we think it is not correct insofar as the Bank benefitted from the transaction in the application of $4,580.26 to Crowe's loan. We think it is clear that in obtaining the money and applying it to the Bank's loan, Drake, to that extent acted within the scope of his authority as an agent of the Bank.

Upon a new trial the jury should be clearly instructed upon the principles which apply. In the event the jury should find that a confidential relationship did not exist, then the principles of fraud and deceit would apply. If a confidential relationship should be found to exist, then the requirements of full disclosure and adequate consideration and liability for resulting abuse of the relation apply.

We find nothing in the record to justify our disturbing the judgment in favor of Alice Wisthuff against Merwin E. Crowe in the sum of $15,000, for the reason that her damages by reason of his conduct may well have equalled that sum including interest upon her lost investment, and costs of becoming involved in litigation with third parties by reason of the fraud. We do not agree that the record shows that he is clearly free of all participation.

The judgment in favor of Melvin State Bank against Alice Wisthuff in the sum of $16,923.75 is reversed.

The judgment in favor of Alice Wisthuff against Merwin E. Crowe in the sum of $15,000 is affirmed.

The judgment in favor of the Melvin State Bank, and against Alice Wisthuff on her counterclaim, is reversed and remanded for new trial.

The judgment in favor of Frederick D. Drake and against Alice Wisthuff on her third-party complaint is reversed and remanded for new trial.

Reversed and remanded.

SMITH, P. J. and CRAVEN, J., concur.