THE STATE BANK OF GENEVA *et al.*, Plaintiffs-Appellants, v. JUDITH L. SORENSON *et al.*, Defendants-Appellees.

Second District   No. 2—87—0398

Opinion filed March 28, 1988.

John S. Noble, of Ruddy, Myler, Ruddy & Fabian, of Aurora (C. John Ruddy, of counsel), for appellants.

Paul Harrison Stacey, of Wheaton, for appellee Judith L. Sorenson.

JUSTICE INGLIS delivered the opinion of the court:

Plaintiffs, State Bank of Geneva, a banking corporation of the State of Illinois (bank), and State Bank of Geneva, a banking corpora-

tion of the State of Illinois, as trustee under the provisions of a trust agreement dated January 7, 1981, and known as trust No. 140—437, brought a foreclosure action on property used as collateral to secure a $42,000 note. Defendants, Judith Sorenson and Dusan Zivo, executed the note with the bank. The note was secured by real estate belonging to Sorenson. The trial court exercised its equitable powers and reduced the amount of possible recovery from $42,000 to $10,000. Plaintiffs appeal. We reverse and remand this case to the trial court with directions.

In December 1980, Zivo contacted bank officer Robert Cox and requested a $10,000 business loan. Zivo had a loan history with the bank dating back to 1972 and was responsible for a preexisting debt of approximately $30,000. Zivo's preexisting debt was secured by three automobiles. Because Zivo was unable to produce sufficient new collateral to secure his subsequent loan request, his application was rejected. Pursuant to Zivo's request, Sorenson, who was at that time Zivo's fiancee, agreed to use her house as collateral for the new loan. Zivo then reapplied for the loan pledging Sorenson's house as collateral.

Cox presented Zivo's request to the loan committee and suggested that the bank issue a note for $42,000 representing Zivo's preexisting debt plus a fresh cash disbursement of $10,000. Under Cox' proposal, Zivo's preexisting debt would be cancelled and the three automobiles held as collateral would be returned. The bank would then have "a $42,000.00 junior mortgage through [a] land trust on the $42,000.00 note" with Sorenson's property as the collateral. The bank approved the loan as proposed by Cox.

Sorenson subsequently executed two documents dated January 7, 1981, placing her property in a land trust with the bank as trustee. Sorenson further executed a third document, also dated January 7, 1981, captioned "Collateral Assignment Under Land Trust." That document provided that Sorenson, as owner of 100% beneficial interest under the trust agreement, assign that interest "as security for the prompt payment when due of any and all obligations, indebtedness and liability of the undersigned & Dusan Zivo to the Bank whether such obligations, indebtedness or liability is now existing or hereinafter created." Following the creation and assignment of the trust agreement, Sorenson and Zivo executed a "Note And Security Agreement" dated January 16, 1981. The face of that document provided, in pertinent part:

"No. 18213 GENEVA, ILLINOIS Jan. 16, 1981 Amount $42,000, for value received, the undersigned Debtors, jointly

and severally, promise to pay to the order of STATE BANK OF GENEVA *** at its office in GENEVA, ILLINOIS, the principal sum of Forty-two thousand and no/100—Dollars in installments of $586.92 each and final installment of $41,654.11 Beginning on Feb. 25, 1981, and due on Jan. 25, 1984 which payments include principal and interest at the rate of 16% per annum ***.

To secure payment of this note to Bank, other existing and future indebtedness and obligations of Debtors, or any of them, Debtors hereby pledge and grant to Bank a security interest in the following property:

> Assignment of Beneficial Interest in Land Trust, Trust No. 140—437, dated 1-7-81 State Bank of Geneva, Trustee ***.

***

### DISCLOSURE STATEMENT

1. Proceeds .................................. $42,000.00
2. Other charges, if any,
   itemized _____ ................ $ _____
3. Prepaid Finance Charge,                          $    840.00
   Closing fees
       if any ........................ $_____
   Required Deposit Balance,
       if any ........................ $_____
   Total Prepaid Finance Charge
       and Required Deposit Balance
       if any ................................ $_____
4. Amount Financed (Sum of 1 & 2
   minus 3)................................... $41,160.00
5. FINANCE CHARGE ...................... $21,036.31
   (For purposes of computing the
   finance charge a demand note is
   considered to have a maturity of
   one-half year)
6. Total of Payments ......................... $62,196.31

ANNUAL PERCENTAGE RATE ............... 16.8432."

Sorenson's signature appears on the face of the note below the terms as set forth above.

In the early part of 1982, the bank instituted the first of two foreclosure proceedings on Sorenson's property. The first foreclosure proceeding was dismissed when the loan was brought current by a payment in the amount of $10,973.72. That payment was delivered to the

bank in the form of a check signed by Sorenson and was accompanied by a second check, immediately following in series and also signed by Sorenson, in the amount of $586.92.

The second foreclosure proceeding was brought on March 8, 1983, and resulted in the instant appeal. At trial, Sorenson testified that she signed the note without reading it and assumed that it was for $10,000 as originally requested by Zivo. Sorenson further testified that she thought the $10,973.72 payment made in response to the first foreclosure proceeding satisfied the entire obligation. Although Sorenson could not recall the purpose of the second check, Cox testified that it represented the upcoming monthly payment. Furthermore, although Sorenson stated that she was never informed of the terms of the note, both Cox and Zivo testified that Cox explained the terms of the note to Sorenson and gave her an opportunity to read the note prior to obtaining her signature.

Additional testimony established that at the time Sorenson executed the note she had completed 3½ years of college and had substantial employment experience in sales. It was further established that Sorenson and Zivo met in 1977 and had been romantically involved from that time until the time the second foreclosure proceeding was instituted. Sorenson recalled that at the time she signed the note she heard Zivo inform Cox that Zivo and Sorenson were going to be married. Further testimony suggested that Zivo had romantic interests outside his relationship with Sorenson which came to light after the transaction. Cox testified that Sorenson accused him of having knowledge of Zivo's romantic interests at the time the transaction took place. Cox further testified that although he knew Zivo was seeing someone else, he thought they had split up.

At the conclusion of the hearing, Sorenson's counsel focused on the credibility of the witnesses and the bank's responsibility to advise Sorenson of the nature of the relationship she was undertaking. Counsel stated:

> "Now, I can't prove that there was a deliberate, calculated effort on the part of the bank to glom onto Judy Sorenson's house.
>
> But, the silence that the bank admittedly adhered to while this was being put together by Zivo and Mr. Cox, just is—it—it imports a tainted transaction."

In its ruling, the trial court apparently adopted Sorenson's argument. The trial court reduced the amount of possible recovery from $42,000 to $10,000. In doing so, the court determined that Zivo had committed a fraud upon Sorenson. Although the court concluded that the

bank was not similarly using Sorenson, it questioned whether the bank had any obligation to point out to Sorenson "the extraordinary circumstances in which she was apparently placing herself." The court stated:

> "However, we come back to this question about how did the $10,000 get translated into $42,000 loan without that information really being transmitted to Judith Sorenson.
>
> * * *
>
> I didn't think the impeachment was so great as to—as to be overwhelming, but it did lead me to wonder whether or not the officers of the bank did not have some knowledge of the marital status of Mr. Zivo, at least to the point of realizing or considering the possibility that he had located and found a naive, trusting person who would—and I think on this evidence that it is true—that Judith Sorenson probably would have signed anything that Mr. Zivo gave her to sign in connection with this transaction.
>
> And, accepting that as a fact, then—then the court asked itself, under those circumstances, and if the bank had reason to believe that those were the circumstances, did the bank have any responsibility of—of—pointing these—this fact out to—to Judith Sorenson.
>
> And, I don't find anything in the case law that was submitted to really answer the inquiry.
>
> The conclusion that I have come to is this: whether its stated in terms of an affirmative duty of the bank to discuss such matters, or whether it is considered from a general approach, such as when a party seeks equity from the Court, it must do equity.
>
> Either way, in—in my judgment, I just don't think that upon these facts the bank is entitled to a foreclosure of the $42,000 obligation that was involved, and I'm saying this as clearly on the record as I can, because I realize that it may go uphill. But I think, because of the peculiar nature of the relationship of these parties, and all the circumstances, that this court is exercising its equitable jurisdiction properly.
>
> Another way of saying it is this: that the Court believes that the bank, if guilty of anything here, was guilty of a silent acquiescence to a fraud that was being committed by Dusan Zivo."

On April 8, 1987, the court entered its final judgment of foreclosure and sale in accordance with these findings. Plaintiffs filed this timely appeal.

Contemporaneous with the filing of her brief, Sorenson filed a motion with this court seeking leave to file her amended first affirmative defense. There being no objections, that motion was allowed. The amended first affirmative defense sought to conform the pleadings to the proofs by raising the equitable doctrine of "unclean hands." On November 3, 1987, we allowed plaintiffs to file a reply to Sorenson's amended first affirmative defense.

Essentially, the question presented by this case is whether a bank has a duty to explain the contents of a document and the consequences of signing that document to a party before obtaining that party's signature. The trial court apparently found such a duty. Plaintiffs challenge the existence of such a duty and further contend that the trial court erred in reforming the note since there was no evidence that the bank committed a fraud on Sorenson.

We approach this case from Sorenson's standpoint as expressed in her brief and motion filed with this court. Sorenson characterizes the trial court's decision as an "express" finding that the bank's conduct in obtaining the mortgage "was tainted with bad faith and misconduct sufficient to justify barring any recovery beyond the amount of $10,000.00 which was the amount contemplated by JUDITH SORENSON when she signed the documents." Thus, in conforming the pleadings to the proofs, Sorenson asserts that the trial court correctly held that plaintiffs were barred from full recovery under the doctrine of "unclean hands." We disagree.

■ It is true that an action to foreclose a real estate mortgage is a proceeding in equity and, as such, traditional equitable defenses may be raised by the mortgagor. (See *First Federal Savings & Loan Association v. Faubion* (1985), 131 Ill. App. 3d 368, 369.) The equitable doctrine of "unclean hands" provides that a party seeking equitable relief cannot take advantage of his own wrong. (*Fair Automotive Repair, Inc. v. Car-X Service Systems, Inc.* (1984), 128 Ill. App. 3d 763, 767-68.) Thus, equitable relief may be denied if the party seeking that relief is guilty of misconduct, fraud, or bad faith toward the party against whom relief is sought, and further provided that the misconduct, fraud, or bad faith is in connection with the transaction under consideration. 128 Ill. App. 3d at 768.

■ However, plaintiffs correctly state that in the instant action there are no allegations that the bank either (1) owed Sorenson a fiduciary duty; (2) altered the note; (3) misrepresented the contents of the note; or (4) directed Sorenson to execute a blank note. There is nothing in the record indicating that the bank ever represented the note to be for only $10,000. The record clearly indicates that the terms of

the note were expressly stated on its face at the time Sorenson signed it. Finally, there is nothing in the record indicating that the bank's conduct toward Sorenson was designed or intended to take advantage of her. Absent such evidence, the doctrine of "unclean hands" does not act to bar plaintiffs' recovery. See 128 Ill. App. 3d at 769; see also *David v. Russo* (1980), 91 Ill. App. 3d 1023, 1029; *Mascenic v. Anderson* (1977), 53 Ill. App. 3d 971, 973.

▮▮ ▮ Moreover, Sorenson's allegation that she was unaware that the terms of the note had changed from the time Zivo requested her to pledge her house as collateral to the time she entered into the transaction is contradicted by both the evidence and this court's concept of common sense. The face of the note clearly provided both numerically and in written form that it was for $42,000. Furthermore, the disclosure statement, also on the face of that document, provided that the amount financed was $41,160; the finance charge was $21,036.31; and the total payments equalled $62,196.31. Finally, Sorenson's signature appears directly below these terms on the same side of the document on which they are printed. If Sorenson did not know that the terms of the note had changed, it is because Sorenson did not read the clearly printed terms on the face of that note.

Failure to read a document before signing it is normally no excuse for a party who signs it. (*Prueter v. Bork* (1981), 105 Ill. App. 3d 1003, 1006.) A party who has had an opportunity to read a contract before signing, but signs before reading, cannot later plead lack of understanding or that the contract misled him. (*In re Marriage of Kloster* (1984), 127 Ill. App. 3d 583, 585.) In the absence of a fiduciary duty, a bank does not have an obligation to explain the legal effect of a document to the person whose signature is sought on that document. (See *Paskas v. Illini Federal Savings & Loan Association* (1982), 109 Ill. App. 3d 24, 31 (bank did not have a duty to explain the legal effect of its rules regarding passbooks since knowledge of the law is equally available to all parties).) In *Pernod v. American National Bank & Trust Co.* (1956), 8 Ill. 2d 16, 21, our supreme court rejected an argument that an elderly lady in poor health was incapable of understanding a trust agreement several pages long and couched in precise and formal legal terms. The court stated that "[i]f such a contention had merit very few modern legal instruments could withstand attacks of the kind made in this case." 8 Ill. 2d at 21.

In the instant action, there is no allegation that a fiduciary duty existed between Sorenson and the bank. In fact, Sorenson affirmatively states that "[s]he has made no allegation of a fiduciary duty." Furthermore, Sorenson is not an elderly lady in poor health who exe-

cuted a long and convoluted trust document. By her own testimony Sorenson established that she had not only completed 3½ years of undergraduate education by the time she entered into the transaction, but also had several years of employment experience in sales. In addition, this is not simply a case of misunderstanding the *legal effects* of a document, but rather ignoring the *contents* of that document. While it is conceivable that one might go through life without developing a strong business acumen, common sense alone dictates that no one, but especially a person with a college education and work experience, should sign a document without first reading it.

The following excerpts from the trial transcript clearly indicate that Sorenson not only failed to read the documents before she signed them, but *chose* not to read them.

"Q. All right. These papers that were signed in the bank, did you have an opportunity to read them before you signed them?

A. I didn't read them before I signed them. They were just there. I was told to sign them and I signed them because it was my understanding that I was using my home for a $10,000 loan, which I agreed to, and I certainly trusted the bank, because I had never had trouble with a bank.

* * *

Q. I would like you to review the Plaintiff's Exhibits 1 through 4, trust agreement, deed in trust, note and security agreement, and collateral assignment under land trust. Do you recall signing those?

A. I don't know what I signed.

* * *

Q. When you were at the closing at the bank, did you ask any questions?

A. No, because I—you know, I mean I—I felt that I knew what was occurring.

* * *

Q. Miss Sorenson, with respect to your trip to the bank when you signed Exhibits 1 through 4, allegedly, do you recall reading those documents while you were at the bank?

A. No. I'm sorry.

* * *

Q. Now, were the documents prepared when you walked into that room [at the bank]?

A. As far as I know. I didn't really read them.

* * *

Q. You don't remember anything? Mr. Stacey [her counsel]

asked you if the documents that were signed were prepared when you got to the bank. You never did answer that question. What is your answer?

A. I didn't read them, so I don't know if they were prepared or not.

* * *

Q. Did you ask anyone to explain to you what the document said?

A. No. I just trusted that this was a loan for $10,000.

Q. Did you tell anyone at the bank that that was what you thought?

A. There were no conversations.

Q. Did you ask for a conversation?

A. Did I ask for a conversation? No.

* * *

Q. Mr. Cox never told you that this was a $10,000 loan; did he?

A. No, I don't think so, not that I recall. I never discussed it with him."

Although it is apparent from the record that Sorenson entered into an unwise transaction with Zivo, it is equally apparent that the bank neither created nor participated in defrauding her. Sorenson could have read the terms of the note prior to signing it, and we will not impose any special duty on the part of the bank for her neglecting to do so. (See *Paskas v. Illini Federal Savings & Loan Association* (1982), 109 Ill. App. 3d 24, 31.) Since there can be no recovery for the breach of a nonexistent duty (see *First Midwest Bank/Joliet v. Dempsey* (1987), 157 Ill. App. 3d 307, 313), we find that the trial court incorrectly reformed the note on general equitable principles.

■ Furthermore, the court's action is not supported under principles governing reformation. It is well settled that reformation of a contract should not be allowed unless clear and convincing evidence compels the conclusion that the contract does not reflect the true intention of the parties *and* there has been either a mutual mistake *or* a mistake by one party and fraud by the other. (*Great American Federal Savings & Loan Association v. Grivas* (1985), 137 Ill. App. 3d 267, 274.) In the instant action, there was an express finding by the trial court that although Zivo was committing a fraud on Sorenson, the bank was not similarly using her. As stated above, there is no evidence that the bank attempted to conceal the contents of the note from Sorenson. In fact, Sorenson freely admitted that although she was given the note to sign, she neither read it, nor asked any ques-

tions about it. Thus, even if Sorenson was mistaken about the terms of the note, there was no fraud on the part of the bank sufficient to justify reformation.

■ Sorenson also defends the trial court's decision on the basis that the portion of the claim barred was not supported by consideration. Citing *Melvin State Bank v. Crowe* (1968), 97 Ill. App. 2d 82, Sorenson argues that a bank may not recover against the maker of a note where no consideration passes from the bank to the maker and where the note represents an existing debt obligation of an unrelated third person. Sorenson contends that since she had no connection to Zivo's preexisting debt, the trial court properly barred the bank's claims against her as to that amount. We disagree.

Sorenson's reliance on *Melvin State Bank* is misplaced. In that case, the court concluded that the cosignatory of a note signed that note only after improper representations by a bank officer. (97 Ill. App. 2d at 96.) The bank officer testified that he told the cosignatory to sign the note because she was already obligated under a separately executed guarantee agreement, a representation which was not true. (97 Ill. App. 2d at 95.) The cosignatory testified that the bank officer did not tell her that she was signing a note, but rather represented that she was signing papers necessary for transferring an account. (97 Ill. App. 2d at 95.) The court determined that, under either scenario, there was insufficient consideration for the cosignatory to sign the note since the bank had already extended the credit to the principal debtor and no new detriment or change of position was taken by the bank as a result of adding her signature. 97 Ill. App. 2d at 96.

In the instant action, in return for Sorenson pledging her house as collateral, the bank cancelled Zivo's preexisting debt, returned the collateral it was holding on that debt, and made a new cash disbursement. Unlike the situation presented in *Melvin State Bank*, the bank in the instant action assumed a significantly different position than it previously held. Furthermore, it is well established that consideration for a mortgage need not move directly from the mortgagee to the mortgagor and may consist of a loan to a third person. (*Peterson Bank v. Langendorf* (1985), 136 Ill. App. 3d 537, 539; *Riddle v. La Salle National Bank* (1962), 34 Ill. App. 2d 116, 119-20.) A benefit to a third person constitutes sufficient consideration for a promise or agreement. (*Affiliated Realty & Mortgage Co. v. Jursich* (1974), 17 Ill. App. 3d 146, 150.) Therefore, Sorenson's contention that there was no consideration for Zivo's preexisting debt must fail.

Accordingly, we reverse the decision of the trial court reducing the amount recoverable on the note from $42,000 to $10,000, and re-

mand this case to the trial court for entry of a judgment of foreclosure in accordance with the original terms of the note and for hearing to determine the balance of principal and interest, plus costs and attorney fees.

Reversed and remanded with directions.

LINDBERG, P.J., and WOODWARD, J., concur.