DONALD L. MILLER, Plaintiff and Cross-Defendant-Appellant, v. JOHN B. WINES, Defendant and Cross-Defendant (Fireman's Fund Mortgage Corporation, Defendant and Cross-Plaintiff-Appellee).

Fourth District   No. 4—89—0456

Opinion filed May 9, 1990.

STEIGMANN, J., dissenting.

Mark S. Goodwin and Robert C. Hofmann, both of Dougherty, Hofmann & Goodwin, of Danville, for appellant.

Sebat, Swanson, Banks, Garman & Townsley, of Danville (Ralph J. Swanson, of counsel), for appellee.

JUSTICE LUND delivered the opinion of the court:

Donald L. Miller (Miller) brought an action in the circuit court of Vermilion County, seeking to quiet title to five acres of real estate. Defendants were John B. Wines (Wines) and Manufacturers Hanover Mortgage Corporation (Manufacturers). Manufacturers subsequently answered and filed a cross-complaint and eventually Manufacturers' name was corrected to Fireman's Fund Mortgage Corporation (Fireman's). Wines was defaulted for failing to appear. On February 28, 1989, judgment was entered in favor of Miller and against Wines, and summary judgment was entered in favor of Fireman's against Miller. Miller appeals from the ruling which held against him in his action against Fireman's.

FACTS

On July 1, 1974, Miller and his then wife entered into a contract with Wines wherein the five acres, which included a residence, were being conveyed to the Millers. The contract provided for installment payments, with deed to be conveyed upon final payment. Wines had the right to mortgage the property to the extent of the unpaid balance of the contract. Upon the Millers' divorce, Miller became sole owner of the contract.

Under the terms of the contract, Miller had possession of the real estate. The purchase price was $28,000 and, by November 13, 1984, the unpaid balance had been reduced to $4,450.80. On November 13, 1984, Wines executed a mortgage to Manufacturers which listed as security the same property which was the subject matter of the Wines-Miller contract. The mortgage purported to secure a loan to Wines from Manufacturers in the amount of $35,000. On November 13, 1984, Miller signed what is entitled "Subordination of Real Estate Contract," which provided:

"WHEREAS John B. Wines, a bachelor[,] by his mortgage dated, November 13, 1984, and recorded in the recorder's office of [V]ermilion County, Illinois, as Document No. 84—7725, did convey unto Manufacturers Hanover Mortgage Corporation certain premises in Vermilion County, Illinois, described as[:] Five (5) acres square out of the Southwest corner of the South-

east Quarter (SE¼) of the Southwest Quarter (SE¼) of section eight (8), Township twenty (20) North, Range eleven (11), West of the Second Principal Meridian, in Vermilion County, Illinois. It is understood that if John B. Wines shall fail to miss payments on said note or shall otherwise be in default, that the holder of said note shall notify the undersigned, Donald L. Miller and he shall have 30 days thereafter to cure said default on behalf of John B. Wines to secure his note for thirty five thousand and no/100 (35,000.00) [***] Dollars with interest payable as therein provided; and

WHEREAS, the undersigned have some right, interest and claim in and to said premises by reason of: Real Estate Contract dated July 1, 1974, between John B. Wines, Seller and Donald L. Miller and Elsa M. Miller, Buyers, in the amount of Twenty Eight Thousand and no/100 ($28,000.00) Dollars[,] but are willing to subject and subordinate his right, interest and claim to the lien of the above mentioned mortgage.

NOW THEREFORE, the undersigned in consideration of the premises and of the sum of ONE DOLLAR ($1.00) paid to the undersigned, receipt of which is hereby acknowledged, do hereby covenant and agree with said Manufacturers Hanover Mortgage Corporation for the use and benefit of the legal holder of the notes described in an[d] secured by said mortgage that the right, interest and claim of the undersigned is and shall be and remain at all times subject and subordinate to the lien of the mortgage to said Manufacturers Hanover Mortgage Corporation.

[A]s aforesaid for all advances made or to be made under the provisions of said mortgage or on the notes secured thereby and for all other purposes specified therein; hereby releasing and waiving all rights under and by virtue of the homestead exemption laws of the State of Illinois.

WITNESS the hand and seal of said Donald L. Miller this 13 day of November, A.D. 1984."

This document was signed by Miller and his signature acknowledged by a notary public.

Wines defaulted on the $35,000 indebtedness, and Miller was faced with losing his equity in the property. Miller contends Wines came to him with the subordination instrument and he was told by Wines he must sign it so that Wines could exercise his right to mortgage during the term of the contract. Miller testified he did not read the instrument, was not paid the $1 consideration, and did not know

the subordination agreement involved more than the unpaid balance on the contract. This testimony is unrebutted.

I

Both parties to this appeal agree that subordination agreements are generally used in transactions like the one in the present case. However, Miller contends that transactions using documents like the one used in the present case should only create a lien on the unpaid balance of the contract. He bases his argument on the theory that since equitable conversion took place upon the execution of the real estate contract, Manufacturers could not obtain a security interest in the Millers' interest unless Miller had executed a mortgage or some instrument similar thereto. Tied with this argument is the contention Miller was owed some specific explanation of the effect of any instrument he executed if it were to be of effect.

■■ Miller correctly states equitable conversion takes place when the owner of land enters into a valid and enforceable contract for its sale. The seller continues to hold the legal title, but in trust for the buyer; and the buyer becomes the equitable owner and holds the purchase money in trust for the seller. (*Shay v. Penrose* (1962), 25 Ill. 2d 447, 449, 185 N.E.2d 218, 219-20.) *Shay* also states the rule that equitable conversion is the treating of land as personalty and personalty as land under certain circumstances.

■■ Miller, while correct in his contention that real estate contracts sometimes result in equitable conversions, erroneously concluded equitable conversion triggers a requirement that the purchaser in a contract can only encumber his equity by an instrument similar to the mortgage Wines executed in favor of Manufacturers. The general rule is that an interest in any property may be assigned. (*First National Bank v. Taylor* (1946), 329 Ill. App. 49, 56, 67 N.E.2d 306, 310; *Merrick v. Daehler* (1972), 5 Ill. App. 3d 269, 272, 282 N.E.2d 163, 165; 3 Ill. L. & Prac. *Assignments* §11 (1953).) Subject to statutory requirements which may be applicable to the particular assignment, no particular form or language is necessary to effect an assignment as long as the intention to transfer is clearly expressed. *Heritage Bank v. Recreational Retail Builders, Inc.* (1981), 97 Ill. App. 3d 748, 423 N.E.2d 573; 3 Ill. L. & Prac. *Assignments* §31 (1953).

■■ The subordination instrument clearly subjects all of Miller's interest in the subject real estate to the Wines' mortgage. The instrument indicates that the Miller interest was being made subject to the lien of the $35,000 debt. It gives Miller the right to prevent foreclosure by paying the debt. The Miller interest could be assigned, and a deed

or mortgage would not be necessary. We find a subordination similar to an assignment and find that the language in the subordination instrument in the present case clearly expresses the intention of the parties. The Miller interest could be subordinated to the mortgage held by Fireman's without the necessity of deed or mortgage. While we have not found a specific case upholding the validity of a subordination agreement, and the parties have cited no such cases, the case of *Hinsdale Federal Savings & Loan Association v. Gary-Wheaton Bank* (1981), 100 Ill. App. 3d 746, 749, 427 N.E.2d 963, 966, so implies.

■ Miller couples his argument that a mortgage should be a requirement to convey his interest, with his statement that Wines told him he had to sign the subordination and that he (Miller) had not read the instrument. The failure-to-read issue was adequately addressed in *State Bank v. Sorenson* (1988) 167 Ill. App. 3d 674, 681, 521 N.E.2d 587, 592, as follows:

> "Failure to read a document before signing it is normally no excuse for a party who signs it. (*Prueter v. Bork* (1981), 105 Ill. App. 3d 1003, 1006.) A party who has had an opportunity to read a contract before signing, but signs before reading, cannot later plead lack of understanding or that the contract misled him. (*In re Marriage of Kloster* (1984), 127 Ill. App. 3d 583, 585.) In the absence of a fiduciary duty, a bank does not have an obligation to explain the legal effect of a document to the person whose signature is sought on that document. (See *Paskas v. Illini Federal Savings & Loan Association* (1982), 109 Ill. App. 3d 24, 31 (bank did not have a duty to explain the legal effect of its rules regarding passbooks since knowledge of the law is equally available to all parties).) In *Pernod v. American National Bank & Trust Co.* (1956), 8 Ill. 2d 16, 21, our supreme court rejected an argument that an elderly lady in poor health was incapable of understanding a trust agreement several pages long and couched in precise and formal legal terms. The court stated that '[i]f such a contention had merit very few modern legal instruments could withstand attacks of the kind made in this case.' 8 Ill. 2d at 21."

■ There is no indication in the record of a fiduciary relationship owing Miller by either Wines or Manufacturers. The subordination language clearly sets forth what was being conveyed. The failure to read, if that is what happened, is unfortunate, but is no excuse.

## II

We next consider Miller's argument of lack of consideration be-

cause of the failure to pay $1. The subordination stated: "in consideration of the premises and of the sum of ONE DOLLAR ($1.00) paid to the undersigned, receipt of which is hereby acknowledged." Miller argues "of the premises" has no meaning, while Fireman's argues it means the overall benefits, including the $35,000 loaned to Wines.

■■ "Premises" is used in two places in the subordination instrument. "[C]ertain premises in Vermilion County Illinois," precedes the five-acre description. Then, "premises" is used in the consideration clause. Black's Law Dictionary defines "premises" as follows:

> "**Premises.** That which is put before; that which precedes; the foregoing statements. Thus, in logic, the two introductory propositions of the syllogism are called the 'premises,' and from them the conclusion is deduced. So, in pleading, the expression 'in consideration of the premises' means in consideration of the matters hereinbefore stated.
>
> *In conveyancing.* That part of a deed which precedes the *habendum*, in which are set forth the names of the parties with their titles and additions, and in which are recited such deeds, agreements, or matters of fact as are necessary to explain the reasons upon which the present transaction is founded; and it is here, also, the consideration on which it is made is set down and the certainty of the thing granted." (Emphasis in original.) (Black's Law Dictionary 1062-63 (5th ed. 1979).)

Fireman's was not giving an interest in the real estate to either Wines or Miller. It was taking an interest. We should not give the same meaning to the word simply because it is used two times on the same page. Words in agreements are to have meaning, and to say the second use of "premises" should be read as the first use of the word would result in the second use being meaningless. We conclude that "in consideration of the premises" means in consideration of all the benefits of the loan secured by the mortgage referred to in the subordination and executed by Wines.

■ Miller was not receiving the loan money and he was giving his equity as security for that loan. The benefit from the subordination was to Manufacturers and the consideration for the execution of the mortgage and subordination was the loan to Wines, not to Miller. The $1, according to undisputed testimony, was not paid. It is necessary to conclude that Miller did not directly receive consideration for the execution of the subordination. When consideration for a promise or agreement affecting an interest in property is insufficient or wholly lacking, the promise or agreement is unenforceable. *Rock Island Bank & Trust Co. v. Stauduhar* (1978), 59 Ill. App. 3d 892, 899,

375 N.E.2d 1383, 1388.

■ However, there is an established principle of contract law that a benefit to a third person may constitute sufficient consideration for a promise or an agreement. (*Affiliated Realty & Mortgage Co. v. Jursich* (1974), 17 Ill. App. 3d 146, 150, 308 N.E.2d 118, 122; 12 Ill. L. & Prac. *Contracts* §78 (1983); 17 C.J.S. *Contracts* §89 (1963).) New money went to Wines because of the subordination by Miller. A third party was thus benefited by Miller's execution of the subordination and this served as consideration for Miller's execution of the subordination. The finding of this consideration requires that the trial court's decision on this issue be affirmed.

The harshness of the results of the trial court's ruling and our decision is recognized. However, any other result would invite chaos into the field of contract law. As stated in *Sorenson,* a party normally must be charged with determining the contents of instruments being executed.

Affirmed.

SPITZ, J., concurs.

JUSTICE STEIGMANN, dissenting:

While I have no disagreement with the majority's assessment of the present law applicable to this case and the result it compels, I respectfully dissent because I conclude the law must be changed. While I am normally very reluctant to advocate judicial modification of the law, this case is the exception for two reasons: (1) as shown by the absence of any statutory citations in the majority opinion, the law in this area is all judge-made to begin with, thus modification would not be infringing upon any legislative prerogatives, and (2) the result which the present law compels is truly unconscionable.

A short version of the events in this case is the following. In June 1974, Miller entered into an installment contract for deed with Wines, wherein Wines conveyed five acres, including a residence, to Miller. The purchase price was $28,000. The contract provided for installment payments, with the deed to be conveyed by Wines to Miller upon final payment. Wines retained the right to mortgage the property to the extent of the unpaid balance of the contract. Under the terms of the contract, Miller took possession of the real estate and resided thereon.

By November 13, 1984, Miller had paid over $23,500 to Wines on this contract, leaving an unpaid balance of approximately $4,500. On

November 13, 1984, Wines executed a mortgage with the Fireman's Fund Mortgage Corporation in order to secure a loan to Wines in the amount of $35,000. The mortgage Wines executed to the mortgage company listed as security the real estate which was the subject matter of Wines' contract with Miller.

On November 13, 1984, Miller signed a document entitled, "Subordination of Real Estate Contract," through which Miller purportedly subordinated his $24,500 interest in this real estate to the mortgage company.

In exchange Miller got—nothing!

When questioned at oral argument, counsel for the mortgage company was unable to suggest how Miller benefitted in the slightest from executing the subordination agreement. Instead, the mortgage company claims that under the law, any such benefit to Miller need not be shown as long as somebody benefitted, namely, Wines.

In its brief to this court, the mortgage company argues (one hopes "tongue-in-cheek") that the subordination agreement "is clear and unambiguous." By reviewing the early pages of the majority opinion, the reader can judge for herself whether the subordination agreement is "clear and unambiguous." It seems to me that the agreement is an example of legalese at its worst, clearly (and probably intentionally) beyond the ken of all but the most intelligent and financially sophisticated laymen.

This record shows that Wines wanted to borrow $35,000 and that the mortgage company was happy to lend Wines that money, as long as it had the collateral of a 100% interest as first mortgagor in the real estate upon which Miller was living. That interest protected the mortgage company in the event that Wines defaulted on the loan. Wines in fact did so. It is clear from this record that Miller derived no benefits of any kind from signing the subordination agreement.

This is not a case in which some relative or close friend is, in effect, cosigning a note to secure a loan. There is no hint in this record that Miller and Wines had anything other than an arm's-length business relationship. Instead, this is a case in which the mortgage company knew that Miller was going to be asked by Wines to sign the subordination agreement, and it knew that Miller would derive no benefit therefrom, while signing away what is likely to be the major financial asset of his life.

Miller testified that he signed the agreement because Wines told him he had to in order to permit Wines to mortgage the equity that Wines had left on the property. Whatever the evidence may be concerning Miller's motivation for signing the subordination agreement,

there is no conflict that Miller got nothing for his doing so.

At all times, there was one party to this three-way transaction that knew precisely what was taking place: the mortgage company. Yet the mortgage company would have this court become its accomplice in stripping Miller of his land and home based upon the legal charade the mortgage company engineered. I simply do not think this court can be any part of it.

This case demonstrates that the time has come to require a mortgage company to insure that a subordinated land owner such as Miller has *knowingly and voluntarily* waived the extent of his interest in the land in question before a court in litigation of this kind will give effect to any such subordination agreement. It is not necessary at this point to speculate as to what steps a mortgage company should take in order to demonstrate the knowing and voluntary nature of any such waiver. I am confident that legal counsel employed by such companies, given the incentive of making their mortgages stick, will figure it out.

The imposition of an affirmative duty in a civil law context, upon a person who is an expert in the law and who has the resources to execute that duty to insure a knowing and intelligent waiver by a third party who may be unsophisticated, is not unprecedented. This court recently had occasion to impose such a duty upon executors of estates who seek to apply the doctrine of estoppel to bar a legatee from contesting provisions of a will under which that legatee inherits a home which had been her long-term residence. (See *In re Estate of Nichols* (1989), 188 Ill. App. 3d 724, 544 N.E.2d 430.) Before that doctrine of estoppel, normally applicable to probate cases, could be applied to such a person, this court stated the following:

> "By this holding, we are placing an affirmative duty upon executors of estates to take whatever steps they deem necessary in order to demonstrate that an occupant of a residence that passes to that occupant under a will, such as plaintiff in this case, has *knowingly and intelligently elected* to receive the benefits given to her under that will." (Emphasis added.) *Nichols*, 188 Ill. App. 3d at 727, 544 N.E.2d at 432.

The majority in this case concludes its opinion by stating the following:

> "The harshness of the results of the trial court's ruling and our decision is recognized. However, any other result would invite chaos into the field of contract law." 197 Ill. App. 3d at 454.

If this case is an example of what passes for law and justice in the

"field of contract law," then it deserves the chaos the rule I am proposing might cause. Surely at some point the courts must tell the business community that unconscionable injustices will not be tolerated further merely because the courts have gotten into the habit of doing so.

The rule now proposed would not be prospective only. I would apply it to this case and reverse and remand to the trial court to give the mortgage company an opportunity to demonstrate a knowing and voluntary waiver of Miller's rights when he signed the subordination agreement. I am aware that such changes in the law are normally made prospective only. However, this is not the normal case. Further, I would regard any argument that the mortgage company might make in this case that holding them to this new standard would be unjust to be little more than a bad joke.