In re LUNAN FAMILY RESTAURANTS, Debtor.

MARRIOTT FAMILY RESTAURANTS, INC., Plaintiff,

v.

LUNAN FAMILY RESTAURANTS and Bank of America Illinois, Defendants.

BANK OF AMERICA ILLINOIS, Cross–Plaintiff and Counterplaintiff,

v.

LUNAN FAMILY RESTAURANTS, Cross–Defendant,

and

Marriott Family Restaurants, Counterdefendant.

Bankruptcy No. 94 B 21227.
Adv. No. 95 A 00110.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

April 3, 1996.

430

Mitchell E. Jones, John A. Lipinsky, Rooks Pitts and Poust, Chicago, IL, for Plaintiff Marriott.

Thomas S. Kiriakos of Mayer Brown & Platt, Chicago, IL, for Defendant Bank of America Illinois.

Thomas E. Raleigh, Brenda Porter Helms, Raleigh Helms & Finke, Chicago, IL, for Defendant Lunan.

### MEMORANDUM OPINION ON BAI'S MOTION FOR SUMMARY JUDGMENT

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary case relates to the bankruptcy proceeding filed by Lunan Family Restaurants ("Lunan" or "Debtor") under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Plaintiff Marriott Family Restaurants, Inc. ("Marriott") has filed a three-count Adversary Complaint against Lunan and Bank of America Illinois ("BAI") (formerly known as Continental Bank) to determine the validity, extent, and/or priority of BAI's lien and the interests of Marriott and Lunan in certain proceeds from sale of Debtor's restaurant property. Marriott also maintains in each count that it is entitled to an administrative priority claim from the sale.

BAI filed an answer, cross-claim, and counterclaim to determine the validity, priority, and extent of its asserted liens or other interests in the property that was sold and for declaratory relief. Both the Complaint and Counterclaim seek a declaration as to whether BAI (as mortgagee secured by the sold properties) or Marriott (as lessee or sublessor of those properties) is entitled to proceeds from sale of four restaurants (known as the Leased Restaurants) which Lunan formerly owned in fee simple.

The defendant BAI moved for summary judgment on all three counts of the complaint and on both counts of its cross-claim and counterclaim. The parties filed statements and cross-statements of undisputed facts under Local Bankruptcy Rule 402.M and N.[1] Pursuant thereto and to the Adversary pleadings, the undisputed facts follow. Based on those facts and for reasons stated herein, by separate order BAI's Motion for Summary Judgment is allowed.

### Facts as to Which There is No Material Dispute

Lunan Family Restaurants, the Debtor, is an Illinois Limited Partnership. The purpose of this partnership was to acquire, develop, and operate Shoney's franchises in the Chicagoland and Northern Indiana area. In October 1990, Lunan entered into a Market Development Agreement with Shoney's to develop the Shoney's franchises; operations began in October 1991. Also in October 1991, Lunan acquired 29 properties from Marriott which were then operating under the name of WAGS restaurants. Some of the WAGS restaurants were sold to Lunan in fee simple and some of them were leased from Marriott to the Debtor. BAI provided the financing necessary to complete acquisition of stores as well as funds for remodeling and converting the stores into Shoney's. The purchase price was $19.2 million, $12 million of which was paid by Lunan to Marriott in cash. Marriott also provided $7 million in subordinated notes and $1.5 million in equity through loans to two of Lunan's principals. Repayment of the notes was subordinated to repayment of the debt due to BAI.

At the end of 1993, Debtor posted a loss and realized that anticipated sales were not sufficient to meet the debt obligations. Thus, on March 30, 1994, Lunan, BAI, and Marriott entered into an asset transfer and debt restructuring agreement ("Restructuring Agreement"). In this agreement, Marriott extinguished the $7 million in subordinated notes and the $1.5 million in loans in exchange for a "leasing" arrangement on certain properties owned by Lunan in fee and for proceeds from sale of certain other fee properties.

Lunan filed its voluntary petition for Chapter 11 reorganization on October 25, 1995. Subsequently, the four restaurants involved in this adversary proceeding (the "Leased Restaurants") were sold free and clear of all

---

1. Rules 12.M and 12.N of the Rules of the District Court for the Northern District of Illinois are virtually identical to Local Rules 402.M and 402.N of the Bankruptcy Rules of the United States District Court and the Bankruptcy Court for the Northern District of Illinois.

liens with liens to attach to sale proceeds. The Hoffman Estates Property was sold pursuant to an order dated January 26, 1995. Under the terms of that sale, Lunan neither assumed nor rejected Marriott's leasehold interest. *See* Order Authorizing Sale of Hoffman Estates and Buffalo Grove Properties and Payment of Real Estate Commission dated as of January 26, 1995 ("Hoffman Estates Order"). The Orland Park Property was sold pursuant to an order dated March 17, 1995. That sale was expressly made free and clear of Marriott's interest in the Orland Park Property. *See* Order Authorizing the Sale of Property of the Estate Other than in the Ordinary Course of Business; Approving the Assumption and Assignment of Subleasehold Interests; and Authorizing Payment of Broker's Commission, dated March 17, 1995 at ¶ 3 ("Orland Park Order"). On April 27, 1995, the Ashland Avenue Property was sold pursuant to order. *See* Order Authorizing Sale of Ashland and Addison Properties and Payment of Real Estate Commission ("Ashland Order"). On August 31, 1995, the Evergreen Park Property was sold pursuant to order. *See* Order Authorizing Sale of Evergreen Park Property and Payment of Real Estate Commission ("Evergreen Park Order"). Marriott's lease and sublease in the Ashland Avenue and Evergreen Park Properties were deemed to be rejected. *See* Ashland Order at ¶ h; Evergreen Park Order at ¶ b.

To supply more detail to the foregoing, the following additional facts are found to be without material dispute:

1. Marriott Family Restaurants, Inc. ("Marriott") is a Maryland Corporation. 402.M at ¶ 1.

2. Lunan is an Illinois Limited Partnership and the debtor in these bankruptcy proceedings. 402.M at ¶ 2.

3. BAI is a state banking corporation. 402.M at ¶ 3.

4. Prior to March 30, 1994, Lunan had committed certain defaults under the September 30, 1991, Loan and Security Agreement ("Bank Agreement")[2] between Lunan and BAI as amended by the First Amendment and Extension Agreement dated as of November 29, 1993. 402.M at ¶ 8.

5. On March 30, 1994, BAI and Lunan entered into an Amended and Restated Loan and Security Agreement ("Amended Bank Agreement") and related security agreements, instruments, and documents. 402.M at ¶ 9.

6. To secure its obligations under the Loan Agreement, Lunan executed a mortgage in favor of BAI and covering, *inter alia,* the Leased Restaurants, which was recorded October 2, 1991 ("Mortgage"), as document number 91–953468 with the Cook County Recorder and which was amended by the First Amendment to Mortgage, Assignment of Leases and Rents, Security Agreement and Financing Statement which was recorded in the Cook County Recorder's office on April 22, 1994, as Document No. 94361947 ("Amended Mortgage"). 402.M at ¶ 10.

7. Prior to March 30, 1994, Lunan was in default under the terms and conditions of a Restaurant Purchase Agreement dated September 25, 1990, by and between Marriott and Lunan, and as amended, and all related documents, including, without limitation, certain subleases for various premises, concerning the sale to Lunan by Marriott of 29 former Wag's Restaurants. 402.M at ¶ 11.

8. As part of the restructuring, Lunan wanted to restructure its debt with Marriott and change its equity position with respect to certain Restaurants. In order to accomplish the restructuring, Lunan, Marriott, and BAI entered into an Asset Transfer and Debt Restructuring Agreement dated as of March 30, 1994 ("Restructuring Agreement"). 402.M at ¶ 12.

9. In pertinent part, the Restructuring Agreement provided:

**2.** Marriott argues that the term "Bank Agreement" is not defined in any of the documents. However, § 2.13.4 of the Restructuring Agreement between Marriott, Lunan and BAI states, "... that certain Loan and Security Agreement dated as of September 30, 1991 and as amended and restated on or before the Transfer Date and as the same may be further amended, restated, extended, or modified thereafter (the "Bank Agreement")...." Restructuring Agreement at § 2.13.4.

(i) Lunan would terminate Subleases on six Restaurants and turn the Restaurants over to Marriott. BAI agreed to release its liens on the leasehold interests and the furniture, fixtures and equipment located at those six restaurants;

(ii) Lunan would lease to Marriott four of the Restaurants owned in fee by Lunan at a rental of one dollar per year. Marriott would sublease the Leased Restaurants back to Lunan for an annual rental per unit of $25,000 for the first year and increasing each year that the New Subleases were in effect. Upon Lunan's repayment to BAI of all Liabilities owing to BAI, BAI agreed to release its lien on the Leased Restaurants and Lunan agreed to transfer its fee interests in the Leased Restaurants to Marriott for ten dollars each;

(iii) Lunan would sell two Restaurants to BC Chicago, Inc. BAI agreed to release its liens on the two Restaurants and agreed that 50% of the net proceeds would be distributed to Marriott and 50% would be distributed to BAI; and

(iv) Lunan would actively market and sell four restaurants owned in fee by Lunan, and BAI agreed that 20% of the net proceeds would be distributed to Marriott (until Marriott was paid a total of $600,000 from the sales to BC Chicago, Inc. and these sales) and 80% would be distributed to BAI. 402.M at ¶ 13.

10. Certain "Leased Restaurants" referenced herein, were owned in fee simple by Lunan and consisted of the following proper-

ties: (a) 14860 LaGrange Road, Orland Park, Illinois; (b) 3020 North Ashland Avenue, Chicago, Illinois; (c) 2250 Barrington, Hoffman Estates, Illinois; and (d) 2507 West 9th Street, Evergreen Park, Illinois. 402.M at ¶ 14.

11. The provisions of the leases and the new subleases were set forth in Section 2.13.1 of the Restructuring Agreement. 402.M at ¶ 15.

■ 12. In the Restructuring Agreement, Marriott acknowledged that the Mortgage continued to be superior and in all respects senior to leases on the Leased Restaurants and the new subleases with respect to the Leased Restaurants.[3] 402.M at ¶ 16.

13. In conjunction with the execution of the Restructuring Agreement, Marriott and BAI entered into the Lien Subordination Agreement ("Subordination Agreement"). 402.M at ¶ 17.

■ 14. As part of the Restructuring Agreement and as more fully set forth in the Subordination Agreement, the leases from Lunan to Marriott were subordinate to and subject to the existing security interest of BAI in the fee interest of Lunan in the Leased Restaurants.[4] 402.M at ¶ 18.

15. On October 25, 1994, Lunan, which operated family-style restaurants under a Shoney's Inc. franchise, commenced this bankruptcy case. BAI is Lunan's largest secured creditor, and Marriott is Lunan's other major creditor. 402.M at ¶ 19.

---

3. Marriott admitted the substance of this paragraph in its Amended Complaint at ¶ 18. It cannot use its 402.N Statement to contradict that which it has already pleaded. It is true that, in considering a motion for summary judgment, this Court is required to view the record in a light most favorable to the non-moving party. However, "the Court has an obligation to confirm that materials referenced as supporting the existence of an undisputed fact do actually support that fact." *Bryson*, 187 B.R. 939, 946 n. 8 (1995).

Marriott is now relying on an affidavit of its vice president, Taylor Jennings, to dispute this paragraph. In a motion for summary judgment, affidavits are filed pursuant to Rule 56(e), which requires, in part, that an affidavit *"set forth facts that would be admissible in evidence."* *Bryson*, 187 B.R. at 949 (emphasis added). It is well established that, where the terms of a contract

are clear and unambiguous, parol evidence is inadmissible to show intent or meaning. As discussed below, the Restructuring and Subordination Agreements are clear and unambiguous, and the contradictory statements from Jennings' affidavits will not be considered as they constitute parol evidence.

4. This paragraph is considered undisputed for two reasons. First, it is almost a direct quote from Marriott's *Amended Complaint* at ¶ 15. Marriott cannot use its 402.N Statement to contradict what it has already pleaded and admitted. Second, the contradictory portions of Jennings' affidavit comprise parol evidence concerning Marriott's intentions and state of mind at the time of contracting and are thus inadmissible to contradict the clear and unambiguous language in the contracts. *See supra*, n. 3.

16. BAI has an allowed, secured claim against the Debtor in the amount of $13,784,046.43 which includes $35,398.94 in prepetition attorneys fees and expenses incurred by the bank as well as $13,481,700 in principal and $266,947.49 in accrued and unpaid interest through October 25, 1994 (the "Petition Date"). 402.M at ¶ 20; Kiriakos Affidavit ¶ 3.[5]

17. The aggregate fair market value of the Leased Restaurants is substantially less than the uncontested portion of BAI's claim. 402.M at ¶ 21.[6]

18. The Leased Restaurants that Lunan has sold to date have been sold pursuant to 11 U.S.C. § 363. 402.M at ¶ 22.

### Disputed Facts

There are no material disputed or contested issues concerning BAI's motion for summary judgment.[7]

### Lunan's Filings

Debtor Lunan Family Restaurants was a named party defendant to this adversary proceeding. However, it did not file a Rule 402.N Response to the Motion for Summary judgment. Instead, it filed a "Statement and Position of Lunan Family Restaurants with Respect to Motion of Bank of America Illinois for Summary Judgment" ("Lunan Statement") which states: [8]

> To the extent that the Summary Judgment Motion seeks a determination from this

---

5. Marriott objects to the statement of facts set forth in ¶ 20 in that it is not adequately supported. Originally, paragraph 20 of BAI's 402.M Statement was made and apposed in the 402.N Statement, each without reference to supporting materials. Pursuant to order, both parties were given the opportunity to submit additional supporting materials. Those were since filed. Among the materials submitted was the affidavit of BAI's attorney, Thomas Kiriakos. Marriott countered that this affidavit is insufficient in that Kiriakos is not a representative of BAI. Marriott also argues that the December 28, 1995, Order withdrawing the Debtor's objection to the amount of BAI's claim which was referenced in and filed with Kiriakos' affidavit does not "allow" BAI's claim.

Affidavits filed in a motion for summary judgment are governed by Rule 56(e) which provides:
> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify as to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

Fed.R.Civ.P. 56(e). Nothing in the Rule suggests that a party's attorney may not submit an affidavit. The only requirement is that the attorney have personal knowledge of the subject matter of the affidavit. Kiriakos, BAI's lead counsel in connection with Lunan's bankruptcy proceeding, claims to have personal knowledge of BAI's claim and the affidavit is facially proper. Moreover, no notice was presented to strike the affidavit. Finally, under § 502(a), a properly filed proof of claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). As recognized by the agreed order, December 28, 1995, there was withdrawn, with prejudice, the only objection to BAI's claim. Thus, the notice and hearing requirements of § 502(b) are not implicated. BAI's claim has indeed been allowed.

6. As with the preceding paragraph, BAI originally submitted this allegation without supporting materials. However, BAI's supplementary statement included a number of exhibits referenced in Kiriakos' affidavit which showed that the gross aggregate sales price from the sale of the Leased Restaurants was $3,670,000 while BAI's allowed claim is $13,784,046.43. Marriott disputes this allegation as being irrelevant. However, the extent of BAI's security interest is relevant to the disbursal of proceeds from the sales of the Leased Restaurants. Thus, this paragraph is found to be a relevant fact, as well as undisputed.

7. Marriott, in its 402.N Statement, asserted as an additional fact that the Leases were only subordinate to BAI's liens if Lunan's interest in the Leased Restaurants was being terminated or transferred in connection with a total foreclosure by BAI:

> As part of the Restructuring Agreement, the leases from Lunan to Marriott were subordinate to and subject to the presently existing security interests of BAI in the fee interest of Lunan in the leased restaurants only if Lunan's possession of the Lease [sic] Restaurants was being terminated or transferred by deed in lieu of foreclosure by BAI against all the assets of Lunan.

402.N Statement ¶ 23. However, as discussed below, § 2.13.3 of the Restructuring Agreement does not limit BAI's priority to situations in which it forecloses upon all of Lunan's assets. Marriott's interest was fully subordinated to BAI's interest regardless of whether BAI initiated foreclosure proceedings. Therefore, paragraph 23 of Marriott's 402.N statement was mere argument and cannot be taken as an undisputed fact.

8. Lunan's Statement contains two paragraphs which are marked paragraph 8. This reference is to the second such paragraph.

Court that the interest of BAI is superior to the interest of Marriott in proceeds of the sale of the Leased Restaurants, the Debtor agrees with and hereby adopts the Summary Judgment Motion filed by BAI on August 15, 1995.

However, Lunan asks that certain issues raised by its affirmative defenses be reserved for later ruling. Lunan argues that "neither the initial Summary Judgment Motion filed by BAI nor its Reply address the issues raised in the Affirmative Defenses of the Debtor. The Amended Answer and Affirmative Defenses were not filed until after the Summary Judgment Motion was filed." Lunan Statement at ¶ 10.

■ It is well established that any response to a 402.M statement must be in the form of a 402.N statement. Failure to comply with requirements of Rule 402 may result in the opponent's fact statement being deemed admitted. Thus despite Lunan's "adoption" of only that portion of BAI's 402.M Statement which addresses the priority of BAI and Marriott's liens, by not filing the required 402.N statement, Lunan is deemed to have admitted and adopted BAI's 402.M Statement in its entirety.

### Jurisdiction

■ Bankruptcy court jurisdiction extends to all civil proceedings arising under title 11, or arising in or related to cases under title 11. 28 U.S.C. § 1334(b). A proceeding which does not arise under title 11 or does not arise in or is not related to a case under title 11 is not appropriate for bankruptcy judicial determination. See Zerand–Bernal Group, Inc. v. Cox, 23 F.3d 159, 162 (7th Cir.1994). "The phrase 'arising under title 11' describes those proceedings that involve a cause of action created or determined by a statutory provision of title 11." In re Markos Gurnee Partnership, 182 B.R. 211, 220 (Bankr.N.D.Ill.1995); see also In re Spaulding & Co., 131 B.R. 84, 88 (N.D.Ill. 1990) (citing In re Wood, 825 F.2d 90, 96 (5th Cir.1987)). "Arising in" jurisdiction encompasses administrative matters that arise only in bankruptcy cases. In other words, matters not based on any right expressly created by title 11 but without existence outside of bankruptcy. Id. "Related to" jurisdiction describes proceedings which affect the amount of property available for distribution or the allocation of property among creditors. Id. (quoting Home Ins. Co. v. Cooper & Cooper, Ltd., 889 F.2d 746, 749 (7th Cir. 1989)). See also In re Xonics, Inc., 813 F.2d 127, 133 (7th Cir.1987); In re Spaulding & Co., 111 B.R. 689, 692 (Bankr.N.D.Ill.), aff'd, 131 B.R. 84 (N.D.Ill.1990).

■ Ordinarily, bankruptcy courts do not have jurisdiction over disputes between non-debtor parties where the dispute does not involve property of the estate, does not affect administration of the estate, or will not affect recovery of creditors under a confirmed plan. See Zerand–Bernal, 23 F.3d at 161–62; Matter of Xonics, Inc., 813 F.2d 127 (1987); In re Kubly, 818 F.2d 643 (7th Cir. 1987). "Adjudicating competing claims of creditors to the property of a bankruptcy is the central function of bankruptcy law." Xonics, 813 F.2d at 131. However, once the debtor has abandoned its claim to the property, there is no basis for bankruptcy court jurisdiction. Id. Bankruptcy jurisdiction is limited jurisdiction. Although it is designed to provide a single forum for dealing with all claims to the bankrupt's assets, it "extends no farther than its purpose." Xonics, 813 F.2d at 131.

The Complaint and Counterclaim each seek a declaration as to whether BAI, as mortgagee, or Marriott, as lessee/sublessor, is entitled to the proceeds from sale of the Leased Restaurants which Lunan, as of the date of the sale, owned in fee simple. Moreover, Marriott, in the Complaint, maintains that the sale of the Leased Restaurants further entitles it to an administrative claim for each Leased Restaurant sold.

■ As stated, while bankruptcy courts do not generally have jurisdiction over disputes between non-debtor parties, they do when the disputes concern property of the estate. The instant proceeding concerns proceeds from sale of property of the bankruptcy estate. Proceeds from sale of property of an estate are also property of the estate. 11 U.S.C. § 541(a)(6). Further, while BAI has received the proceeds from

sale of the Leased Restaurants, it has received them on a provisional basis only. Neither the bankruptcy estate nor the Debtor has abandoned the proceeds to BAI or any other creditor. The proceeds remain property of the estate, and the bankruptcy court has jurisdiction to determine the parties' interests in the proceeds. *Compare In re Edwards,* 962 F.2d 641, 643 (7th Cir.1992) (no jurisdiction where proceeds were no longer part of the estate).

▮ Not only are proceeds from the sale still part of the bankruptcy estate, the Debtor continues to claim an economic interest in the distribution and allocation of proceeds. Lunan Statement, ¶¶ 13–15. When the parties claiming an interest in certain property include the debtor, the bankruptcy court has jurisdiction to determine the interests of all of the parties concerned. *In re Mueller,* 72 B.R. 280, 284 (C.D.Ill.1987), *aff'd,* 851 F.2d 916 (7th Cir.1988); *cert. denied sub nom., Rogers v. First Nat. Bank of Peoria,* 490 U.S. 1007, 109 S.Ct. 1645, 104 L.Ed.2d 160 (1989) (*citing Xonics,* 813 F.2d at 131; *In re Denalco Corp.,* 57 B.R. 392 (N.D.Ill.1986); *In re Dr. C. Huff Co., Inc.,* 44 B.R. 129 (Bankr. W.D.Ky.1984)). Lunan asserts an interest in the proceeds. Lunan wishes to limit the extent of the application of the proceeds to the principal portion of its obligation to BAI and not to any interest, expenses or other costs. *Id.* at ¶ 11–13, *citing* 11 U.S.C. § 506(b) (limiting recovery of interest on undersecured claims); *but see Kubly,* 818 F.2d at 644 (no jurisdiction where proceeds from sale of assets belonged to non-debtor parties and debtor claimed no interest in them). As the court explained in *Xonics:*

> Suppose A, B, and C claim interests in a pool of oil. If A is a bankrupt, the bankruptcy court could determine the interests of all three in the property under 28 U.S.C. § 157(b)(2) or § 157(c)(1), because only after identifying the "property" of the estate may the court apportion that property among creditors. But if the estate should disclaim any interest in the pool, only the dispute between B and C would

remain. The resolution of that dispute would not affect the creditors of the bankruptcy, and there would be no source of jurisdiction.

*Xonics,* 813 F.2d at 131.

Here, the estate claims ownership of the sale proceeds subject to valid secured claims thereon, and has an economic interest in how the sale proceeds are distributed and applied. Lunan admits that BAI is substantially undersecured. Lunan Answer and Affirmative Defenses to Cross Claim and Counterclaim ¶ 10. However, this fact is neither fatal to jurisdiction nor does it suggest that Lunan is without an interest in the property. Rather, Lunan's "share" of the property will be distributed among Lunan's creditors. *See In re Chicago Cement Co.,* 1990 WL 168950, *6 (N.D.Ill. Oct. 24, 1990); *but see In re Bill Cullen Elec. Contracting Co.,* 160 B.R. 581, 584 (Bankr.N.D.Ill.1993) (where ranking of parties' liens is immaterial to unsecured creditors, court may not have jurisdiction).

▮ Lunan also raises the question as to whether its interest in the proceeds from sale of the Leased Restaurants is actually superior to that of Marriott.[9] Lunan Answer to First Amended Complaint ¶ 15–16. When a determination of priority of liens directly involves the debtor, the matter is properly before the bankruptcy court. Thus, the Court has sufficient jurisdiction to determine the validity, priority, and extent of Marriott, BAI, and Lunan's interests in the proceeds from the sale of the Leased Restaurants.

▮ In the context of the priority of liens issue, Marriott also requests certain declaratory relief. Marriott requests a declaration as to the validity and affect of the Restructuring Agreement and as to the nature of the leases. Jurisdiction is proper as to both of these requests. Although both matters concern contracts governed by state law, the matters are integral to the determination of priority of liens and availability of claims under the Bankruptcy Code. The validity and affect of the agreements directly relate to whether Marriott's interest is subordinate

---

**9.** However, as stated, Lunan failed to address this claim in its summary judgment papers. Thus, Lunan's possible avoidance of Marriott's interest is not properly before the Court at this time.

**442**

to BAI's. Also, the nature of the leases, whether they were in fact "true" leases, is necessary to the determination of Marriott's rights under § 365 and Marriott's alleged administrative claim.

This adversary complaint also deals with Marriott's right to a claim against the bankruptcy estate arising out of the Restructuring Agreement and its entitlement to an administrative priority arising out of the sale of the Leased Restaurants. The allowance or disallowance of an administrative claim would have a material effect on any distribution to which other creditors may be entitled. Claims against the estate, as well as a creditor's right to an administrative claim, arise under title 11. Thus, the Court has jurisdiction as to Marriott's claim against the estate and its alleged administrative priority.

However, this Court cannot rule on Marriott's request for an order requiring BAI to pay Lunan $900,000 per Leased Restaurant as Marriott is not the proper party to bring this request. Property of the estate includes all legal and equitable interests of the debtor in property as of the commencement of the case as well as those interests the estate acquires after the commencement of the case. 11 U.S.C. § 541(a). "A cause of action is property of the estate if the debtor could have asserted the claim on its own behalf under state law ... If a cause of action belongs to the estate, then the trustee has exclusive standing to assert the claim in his capacity as creditor." *Apostolou v. Fisher*, 188 B.R. 958, 966–67 (N.D.Ill.1995) (*citing Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir.1994)). If Lunan has a claim against BAI arising out of the sale of the Leased Restaurants, then that is a cause of action belonging to Lunan alone. There are exceptions to this rule, such as if the trustee or debtor in possession unjustifiably refuses or fails to bring the suit or if the complaint is personal to a specific creditor, *In re Aluminum Mills Corp.*, 132 B.R. 869 (Bankr. N.D.Ill.1991), but no such exceptions have been alleged and none appear to be present. Lunan, as the debtor-in-possession, is the representative properly charged with the responsibility and authority to bring such a

claim. Marriott has no standing to ask for this order. Marriott seems to be attempting use the bankruptcy tribunal to obtain a $900,000 judgment against BAI. Such an action would fall outside bankruptcy court jurisdiction. As Marriott has no standing to request an order requiring BAI to pay Lunan $900,000, that portion of its complaint will be dismissed or stricken.

Thus, subject matter jurisdiction lies under 28 U.S.C. § 1334. This matter is before the Court pursuant to 28 U.S.C. § 157 and Local General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. Venue lies properly under 28 U.S.C. § 1409. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims against the estate) and § 157(b)(2)(K) (determination of validity, extent, or priority of liens).

### Standards for Summary Judgment

Summary judgment motions are governed by Fed.R.Civ.P. 56(c) made applicable to bankruptcy proceedings by Fed.R.Bankr.P. 7056:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment is granted to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986).

The moving party in a motion for summary judgment has the initial burden of demonstrating that there are no genuine issues of material fact and that judgment in its favor should be granted as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). "The party opposing the motion may not rest upon mere allegations or denials in

its pleadings. Rather, its response must set forth in required filings specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. The court should draw all inferences in the light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355–56. Still, a dispute of a material fact will only prevent summary judgment if the disputed fact is outcome determinative under applicable law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

## DISCUSSION

### *Marriott's Complaint*

Marriott's complaint contains three counts. Count I seeks:

(A) a determination regarding the validity, priority and extent of the lien of BAI in the proceeds of sale of the Hoffman Estates property;

(B) a determination regarding the validity, priority and extent of the interest of Marriott in the proceeds of sale of the Hoffman Estates property;

(C) a determination regarding the validity, priority and extent of the interest of Lunan in the proceeds of sale of the Hoffman Estates property;

(D) an order directing BAI to pay Lunan $900,000 from the proceeds of the sale of the Hoffman Estates property;

(E) an order directing Lunan to pay Marriott $900,000 for termination of the Lease of the Hoffman Estates property;

(F) an order declaring the Lease of Marriott in and to the Hoffman Estates Property to be a bona fide lease;

(G) an order declaring that the Restructuring Agreement is valid and binding upon BAI and Lunan;

(H) an order declaring that Marriott has an administrative claim due to Lunan's failure to pay the Buy-out price to Marriott; and

(I) any and all other relief this court deems just.

The Hoffman Estates Property was sold to a good faith purchaser pursuant to an order of this Court dated January 26, 1995. That sale was found to be:

> free and clear of all liens and encumbrances and other interests pursuant to 11 U.S.C. section 363(f), including without limitation, any interest of Marriott whether under its lease and sublease or otherwise ... The interest of any party, including the lien of Bank of America Illinois, will attach to the net proceeds of the sale.

Hoffman Estates Order. In Count II of its Complaint, Marriott asks this Court to enter an order as to the Orland Park Property identical to relief sought in Count I. The Orland Park Property was sold pursuant to an order dated March 17, 1995, entered in Debtor's bankruptcy proceeding. That sale was free and clear of Marriott's interest in the Orland Park Property, and all interests, including BAI's, attached to the proceeds. Orland Park Order at ¶3. In Count III, Marriott again seeks relief identical to that sought in Count I (omitting only a request for determination of Lunan's interest in the sale proceeds). This Count pertains to the other leased properties, Ashland Avenue and Evergreen Park. Both sales were pursuant to orders entered in Debtor's bankruptcy proceeding dated April 27, 1995, and August 31, 1995, respectively. In both instances, Marriott's lease and sublease in the properties were deemed by the agreed orders to be rejected.

### *The Extent of BAI, Marriott, and Lunan's Interests in The Property (Count I: Prayer for Relief (A) (B) & (C); Count II: Prayer for Relief (A) (B) & (C); & Count III: Prayer for Relief (A) & (B))*

 The undisputed facts show that BAI has a valid, prior recorded mortgage on the properties. On September 30, 1991, BAI and Lunan entered into the Mortgage against the Leased Restaurants which secured all of Lunan's obligation to BAI under the Bank Agreement. The Mortgage was recorded on October 2, 1991. Illinois law is well settled that a mortgage, properly recorded, gives the mortgagee priority over

subsequent mortgages. *See, e.g., Firstmark Standard Life Ins. Co. v. Superior Bank FSB,* 271 Ill.App.3d 435, 208 Ill.Dec. 409, 412, 649 N.E.2d 465, 468 (1995) (noting there is a presumption that the first recorded mortgage has priority) (*citing Delano v. Bennett,* 90 Ill. 533 (1878)); *In re Cutty's–Gurnee, Inc.,* 133 B.R. 934, 949 (Bankr.N.D.Ill.1991). Thus, BAI may have a superior lien on the proceeds based on its mortgage alone. Documents entered into subsequent to the mortgage could have affected BAI's priority. As discussed below, however, that did not happen.

On March 30, 1994, BAI and Lunan entered into the Amended Mortgage which was recorded on April 22, 1994. Certain types of modifications to a mortgage document can affect a mortgagee's priority. *See* Robert P. Giesen, *Routine Mortgage Modifications: Lenders Beware,* 17 Real Est.L.J. 221 (Winter 1989).

> It is well established that while a senior mortgagee can enter into an agreement with the mortgagor modifying the terms of the underlying note or mortgage without first having to notify any junior lienors or to obtain their consent, if the modification is such that it prejudices the rights of the junior lienors or impairs the security, their consent is required. Failure to obtain the consent in these cases results in the modification being ineffective as to the junior lienors and the senior lienor relinquishing to the junior lienors its priority with respect to the modified terms. While this sanction ordinarily creates only the partial loss of priority noted above, in situations where the senior lienor's actions in modifying the note or mortgage have substantially impaired the junior lienors' security interest or effectively destroyed their equity, courts have indicated an inclination to wholly divest the senior lien of its priority and to elevate the junior liens to a position of superiority.

*Shultis v. Woodstock Land Development Associates,* 188 A.D.2d 234, 594 N.Y.S.2d 890, 892 (1993) (collecting cases).

In this case, there were not such significant changes to the Leased Restaurants so as to affect BAI's priority. The Amended Mortgage, by virtue of the Amended Bank Agreement, consolidated the outstanding loans into one term loan, but also ratified the original mortgage. Under the Restructuring Agreement and Subordination Agreement entered into between BAI, Marriott, and Lunan in March of 1994, BAI released its liens on and agreed to distribute proceeds from sale of certain specified restaurants. However, the Restructuring Agreement and the Subordination Agreement do not appear to affect BAI's interest in the proceeds from the sale of the Leased Restaurants. BAI's position as senior secured creditor was not changed.

■ "By executing a lien subordination agreement, the subordinating party agrees to demote the priority of its lien to that of another secured creditor, thereby delaying its recourse to the identified collateral until the other party's secured claim has been satisfied." *In re Lantana Motel,* 124 B.R. 252, 256 (Bankr.S.D.Ohio 1990) (*citing generally* U.C.C. § 9–316). Thus, the terms of the Subordination and Refinancing Agreements define the parties' interests and priorities.

■ In the related bankruptcy proceeding, this Court found as to the Hoffman Estates Property that

> Marriott has subordinated all claims under the lease to the lien of the bank in flat terms. And not just when there is a foreclosure but for all time and all ways under their [Subordination Agreement] ... That means Marriott can't collect from the proceeds of sale ... The bank primes Marriott's claim to that $900,000 out of the proceeds very clearly by contractual agreement.

Transcript of January 24, 1995, Proceedings to Approve Sale ("Transcript") at 100–101.[10]

■ However, that finding is not conclusive or binding here. Collateral estoppel refers to a judgment's effect of "foreclosing relitigation in a subsequent action of an issue of law or fact that has been litigated and

---

10. This Court's oral Findings of Fact and Conclusions of Law made and entered on January 24, 1995, were incorporated by reference into the January 26, 1995, Hoffman Estates Order.

decided in the initial action." *Havoco of Am. Ltd. v. Freeman, Atkins & Coleman, Ltd.,* 58 F.3d 303, 307 (7th Cir.1995) (citations omitted).

For collateral estoppel to apply, 1) the issue sought to be precluded must be the same as that involved in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must be fully represented in the prior action.

*People Who Care v. Rockford Bd. of Educ.,* 68 F.3d 172, 178 (7th Cir.1995) (*citing Freeman United Coal Mining Co. v. Office of Workers' Comp. Program,* 20 F.3d 289, 293–94 (7th Cir.1994); *La Preferida v. Cerveceria Modelo,* 914 F.2d 900, 906 (7th Cir.1990)). Although the parties argued the extent of Marriott's subordination, before the sale of the Hoffman Estates property was approved no evidence was taken and that issue was not essential to entry of the sale order. That order dealt only with whether sale of the Hoffman Estates Property could be approved over Marriott's objection. Lien subordination was a consideration, but it was not essential to the ruling, nor was the issue actually litigated. Thus, that finding in the order is not preclusive here.

However, pursuant to the unambiguous terms of the Subordination and Restructuring Agreements, Marriott's interest in the Leased Restaurants is indeed fully subordinated to that of BAI.

 Marriott wishes to introduce extrinsic evidence as to the meaning of the Subordination Agreement. It offers an affidavit from Taylor Jennings which states that the Leases and New Subleases were to be subordinated to BAI's interest only in the event of a total foreclosure by BAI. However, the "law is well settled that rights of priority under an agreement of subordination extend to and are limited strictly by the express terms and conditions of the agreement." *Resolution Trust Corp. v. BVS Development, Inc.,* 42 F.3d 1206, 1214 (9th Cir. 1994) (*quoting Miller v. Citizens Sav. & Loan Ass'n,* 248 Cal.App.2d 655, 56 Cal.Rptr. 844 (1967)). "In Illinois, the parol evidence rule excludes evidence which would change the meaning of a written document, if the evidence concerns dealings prior to the writing." *International Administrators, Inc. v. Life Ins. Co. of North America,* 753 F.2d 1373, 1384 (7th Cir.1985) (*citing Bachewicz v. American Nat. Bank & Trust Co.,* 126 Ill. App.3d 298, 81 Ill.Dec. 294, 298, 466 N.E.2d 1096, 1110 (1984), *rev'd,* 111 Ill.2d 444, 95 Ill.Dec. 827, 490 N.E.2d 680 (1986)). However, the parol evidence rule only applies where the document in question was integrated or intended to be the complete agreement between the parties. *See, e.g., Urschel Farms, Inc. v. Dekalb Swine Breeders, Inc.,* 858 F.Supp. 831, 833 (N.D.Ind.1994).

 It is the province of the trial court to determine, as a matter of law, whether a document constitutes a fully integrated writing. *Weber v. DeKalb Corp., Inc.,* 265 Ill.App.3d 512, 202 Ill.Dec. 155, 160, 637 N.E.2d 694, 699 (1994), *appeal denied,* 158 Ill.2d 566, 206 Ill.Dec. 847, 645 N.E.2d 1369 (1994). Mere allegations of intent cannot be used to determine whether a writing was intended to be the complete resolution of negotiations. Rather, a document is integrated if, from the four corners of the writing, it appears to be a complete expression of the party's intentions.

Here, there are several agreements to be considered: the Mortgage, the Amended Mortgage, the Bank Agreement, the Amended Bank Agreement, the Restructuring Agreement, and the Lien Subordination Agreement. Each of these agreements refers to and depends on others. Thus, no single one of these agreements contains a complete expression of the parties' intentions. However, when these agreements are read together, they evidence the complete relevant dealings of the parties. Indeed, BAI and Marriott each contend that the documents as a whole comprise evidence of the entire agreement, and each asks this Court to interpret their plain meaning. Response of Marriott Family Restaurants, Inc. to Motion for Summary Judgment of Bank of America–Illinois ("Marriott Response") at 7–8; Memorandum of Law in Support of Motion of Bank of America Illinois for Summary Judgment ("BAI Memo") at 11–12.

Marriott argues that the writings considered together state that Marriott's interest was not fully subordinated. Alternatively, it argues that the documents are ambiguous as to the extent of subordination. Marriott Response at 9. However, the agreements, as they relate to Marriott's subordination of its interest in the Leased Restaurants, are indeed unambiguous. A complete and unambiguous written contract is presumed to include all material terms, and all prior negotiations are merged into that agreement. Where there is no ambiguity, intentions of the parties should be ascertained from language of the contract, and the court should not consider extrinsic evidence in determining such intent. *See In re Greenfield Direct Response, Inc.,* 171 B.R. 848, 855–56 (Bankr.N.D.Ill.1994) and the authorities cited.

The *Restructuring Agreement* clearly states that on March 31, 1994 (the "Transfer Date"), Lunan was to. lease the Leased Restaurants to Marriott at a rate of one dollar per year for 20 years with two five year optional extensions. Restructuring Agreement at § 2.13.1. Section 2.13.1 states:

> [a]ny such leasehold or subleasehold grant as well as the fee interest in each such Restaurant is and shall continue to be subject to the prior lien of [BAI] *and shall, in all respects, be subordinate and junior to [BAI's] rights in such Restaurant* ... except as limited in Section 2.13.4 below.

*Id.* (emphasis added). "Immediately following the execution of such Leases, [Marriott] shall sublease the Leased Restaurants back to Lunan (each, a 'New Sublease', and collectively, the 'New Subleases')" for 20 years. *Id.* at § 2.13.2. The Lease and New Sublease "*shall be subordinate to and subject to the presently existing security interest of [BAI]*" for the term of the Leases and Subleases. *Id.* at § 2.13.3 (emphasis added). The parties even agreed in the Restructuring Agreement to sign a subordination agreement to that effect. *Id.* at § 2.13.3. Under this clear reading of the Restructuring Agreement, Marriott agreed to subordinate any interests it might have had in the Leased Restaurants to BAI's prior lien.

Although Marriott argues that the documents as a whole contradict this reading, no passage was found that does so. Section 2.13.1 states that Marriott's interests are subordinated to BAI's prior mortgage. This is limited only by § 2.13.4, which states that, upon Lunan's repayment to BAI of all the liabilities Lunan owes to BAI, BAI shall release its lien on the Leased Restaurants, and Lunan will then transfer its fee interest to Marriott. Restructuring Agreement at § 2.13.4. This does not affect BAI priority in the Leased Restaurants; it merely states that, when BAI has been fully compensated, it will release its liens. Further, in Article 6, Marriott agreed that

> [b]y signing this Agreement [Marriott] expressly acknowledges [BAI]'s superior lien position in and to the collateral as described in the Bank Agreement, except that with respect to all existing subleases (*but not the New Subleases*) [Marriott's interest] is superior to the collateral interest of [BAI] and all collateral released by [BAI] pursuant to this Agreement shall no longer be subject to any interest of [BAI].

Restructuring Agreement at § 6.2 (emphasis added). While this affects BAI's lien priority as to certain restaurants, it does not affect BAI's priority in the Leased Restaurants involved this proceeding.

Marriott argues that § 2.13.3 of the Restructuring Agreement provides a specific carve-out to BAI's priority:

> In addition to any foreclosure rights of [BAI] and any other rights and remedies which [BAI] may have against Lunan, [Marriott] agrees that if Lunan's possession of the Lease Restaurants is being terminated or transferred by deed in lieu of foreclosure as part of a foreclosure by [BAI] against all the assets of Lunan, in such event, [Marriott] shall transfer to [BAI] [Marriott's] leasehold interest in each such Leased Restaurant being so transferred by Lunan or foreclosed by [BAI] upon Lunan being dispossessed of the premises.

Restructuring Agreement at § 2.13.3. · This section clearly does not limit the subordination of Marriott to a situation in which BAI forecloses upon all of Lunan's assets; there

are no such words of limitation. Rather, this section gives BAI additional protections. The Restructuring Agreement clearly states that the only limitation as to BAI's priority is in section 2.13.4. *Id.* at § 2.13.1.

The Subordination Agreement comports with the foregoing reading of documents. That Agreement states "[t]he Lease shall continue *at all times* to be subordinate to the Mortgage notwithstanding that the Mortgage may be amended from time to time." Subordination Agreement at ¶ 9 (emphasis added). The above passages are not isolated. The Restructuring Agreement and the Subordination Agreement state, almost to the point of redundancy, that BAI's lien priority as to the Leased Restaurants is superior to Marriott's interest. *See* Restructuring Agreement at § 2.13.1, § 2.13.3, § 6.1, and § 6.2; Subordination Agreement at ¶ E, ¶ 1, ¶ 7, and ¶ 9.

Thus, all the documents are clear and unambiguous in providing that BAI has a prior, valid security interest in the Leased Restaurants. As, such, they cannot be contradicted by Jennings' Affidavits as to the Subordination Agreement's supposed limited effectiveness.

BAI had a valid, prior lien on the Leased Restaurants, and pursuant to the respective orders, BAI's lien attached to the proceeds of the sale. Thus, BAI has a valid, prior secured lien on the proceeds from the sale of the property. Marriott's interest in the Leased Restaurants was fully subordinated to that of BAI pursuant to the Restructuring Agreement and the Subordination Agreement. Unless and until BAI's fully secured claim is paid in full, Lunan has no interest in proceeds from sale of the Leased Restaurants.

### Validity and Binding Nature of the Restructuring Agreement (Counts I, II & III: Prayer (G))

 The Restructuring Agreement is valid and binding on all parties. Restructur-

ing agreements are contracts. As such, they must contain the requisite elements of a contract. *See Oakes v. Michigan Oil Co.,* 476 So.2d 618, 621 (Ala.1985) (citations omitted). These elements are present and undisputed in both the Restructuring Agreement and the Subordination Agreement. The enforceability of such agreements hinges on their enforceability under state law. *In re Chicago, South Shore and South Bend R.R.,* 146 B.R. 421, 425 (Bankr.N.D.Ill.1992); *see also, Miller v. Wines,* 197 Ill.App.3d 447, 143 Ill.Dec. 849, 852, 554 N.E.2d 784, 787 (1990). Such agreements are enforceable in Illinois. *Id.* (*citing* 810 ILCS 5/1–209 (1995)).

The Restructuring Agreement states: "[t]his Agreement is binding upon the parties hereto, their heirs, personal representatives, administrators, successors and assigns." Restructuring Agreement at § 11.7. The Restructuring Agreement was signed by Marriott's vice president, Lunan's sole general partner, and BAI's senior vice-president. No one is arguing that these individuals lacked authority to bind their companies.

### Marriott's $900,000 Claim Against Lunan (Counts I, II & III: Prayers (E))

 Marriott requests judgment against Lunan to pay $900,000 for termination of each lease of the Leased Restaurants.[11] This request is asserted to be pursuant to § 2.13.7 of the Restructuring Agreement which states:

[i]f permitted under the Bank Agreement with Lunan, Lunan shall have the option to terminate the Lease and New Sublease for any one or more of the Leased Restaurants at any time upon payment to [Marriott] of a buy-out price of Nine Hundred Thousand Dollars ($900,000.00) for each Leased Restaurant for which the buy-out option is exercised. Such termination shall be effective from and after the date on which [Marriott] receives both notice of such buy-out and the respective buy-out

---

**11.** The Restructuring Agreement contains a provision whereby Lunan leases the Leased Restaurants to Marriott for one dollar per year for 20 years, and Marriott subleases these same restaurants back to Lunan at an increasing annual rental. Once Lunan repaid all of its liabilities to BAI, BAI would release its lien on the Leased Restaurants and Lunan would transfer its fee interests to Marriott for ten dollars. In addition, Lunan could terminate the leases and subleases at any time upon payment to Marriott of $900,-000 for each Leased Restaurant.

payment of $900,000.00 for any particular Leased Restaurant.

Restructuring Agreement § 2.13.7 (the Buy-out Provision). The Buy-out Provision requires that any sale of a Leased Restaurant be permitted under the Bank Agreement, and it requires termination of the leases. These two issues go to the heart of whether Marriott has a claim against Lunan under the Buy-out Provision.

The only portion of the Amended Bank Agreement [12] that might permit or restrict a sale of the Leased Restaurants is § 6.12:

> From the date of this Agreement and thereafter until all Liabilities of Borrower hereunder are paid in full, Borrower agrees that, unless Lender shall otherwise consent in writing, it will: ... not: ... except in the normal course of its business or as otherwise permitted herein (including *Section 4.4(i)* [which deals with sales of equipment]) or in any Related Agreement, sell, transfer, convey, lease or otherwise dispose of any of its assets....

Amended Bank Agreement § 6.12(ii). The sales of the Leased Restaurants were made as part of Lunan's Chapter 11 reorganization; thus, they were outside Lunan's normal course of business. Such a sale of a Leased Restaurants outside of bankruptcy would only be "permitted under the Bank Agreement" if BAI consented in writing. Although it is true that before this Court, BAI favored the sales of the Leased Restaurants, there has been no showing here that BAI consented to those sales in writing as required under the Bank Agreement. Thus, the sales of the Leased Restaurants were not "permitted under the Bank Agreement."

In addition, Marriott is only entitled to the $900,000 if Lunan terminated the leases. Under the terms of the Lease and the Sublease Agreement (which were attached to the Restructuring Agreement as exhibits), Lunan could only terminate the leases upon notice of Marriott's intention to purchase Lunan's interest, notice from BAI that such buy-out or lease termination would be permitted under the Bank Agreement, and payment by Lunan of $900,000 to Marriott. None of these steps occurred. Thus, the leases were not terminated by reason of § 2.13.7 of the Restructuring Agreement. As a result, Marriott does not have a $900,000 claim under the Buy-out Provision.

This is not to say that Marriott has no claim against Lunan; Marriott just does not have a claim pursuant to enforcement of the Buy-out Provision. Marriott may have a damages claim for breach of contract or otherwise, but that is not at issue here.

### Marriott's $900,000 Claim Against BAI (Counts I, II, & III: Prayer (D))

Marriott also requests a judgment directing BAI to pay Lunan $900,000 out of the proceeds from sales of the Leased Restaurants pursuant to the Buy-out Provision. As previously stated, Marriott does not have standing to request such an order on behalf of Lunan. Therefore, this prayer for relief will be stricken.

### Marriott's "Administrative" Claim: (Counts I, II, & III Prayer (H))

Marriott also seeks a declaration that it has an administrative claim against the Debtor due to Lunan's failure to pay the buy-out price. This effort must fail. First, Marriott does not have the asserted $900,000 claim under the Buy-out Provision. Second, even if Marriott did have such a claim, it would not be administrative nor would it lie against proceeds of sales of the Leased Restaurants.

Marriott argues that it is entitled to an administrative priority because Lunan's postpetition use of the Marriott's leases allowed it to maximize the sale value of those leases on a going concern basis. "The sale of [all] the leases on a going concern basis allowed the debtor to confer approximately $8,000,000 on the Bankruptcy estate post-petition."

---

**12.** Although the original Bank Agreement was not presented as an exhibit with the summary judgment papers, a determination on whether a § 363 sale was permitted under the Bank Agreement can be made here by virtue of the Amended Agreement. The latter Agreement provided that "the parties agree that the Original Agreement is amended and restated in its entirety as follows: ...." Amended Bank Agreement at 1.

Marriott Response at 13. Marriott presented no undisputed facts or documents to support that this asserted benefit was due to the sales in issue here. Moreover, the aggregate gross sales price of the Leased Restaurants was only $3,670,000. Kiriakos Affidavit ¶ 3.

Marriott is asking for an administrative priority based upon asserted post-petition breach of a pre-petition contract. It contends, in effect, that a breach post-petition of a pre-petition arrangement can confer an administrative priority upon a creditor.

▪▪▪ Bankruptcy courts have discretion in awarding administrative expense priority, but this discretion is limited by the Bankruptcy Code's requirement that the debt be an actual and necessary cost of preserving the estate. *In re Englewood Community Hosp. Corp.*, 117 B.R. 352, 358–59 (Bankr.N.D.Ill.1990). Only those debts that arise after the filing of the bankruptcy petition may be accorded administrative expense status. *In re United Trucking Service Inc.*, 851 F.2d 159, 161 (6th Cir.1988). Administrative expense priorities are narrowly construed to include only those creditors that perform actual and necessary services that preserve the bankrupt estate or enable the debtor-in-possession to maintain its business and to maximize the value of the estate for all creditors. *United Trucking*, 851 F.2d at 161–62, 164; *Englewood*, 117 B.R. at 358; *In re CIS Corp.*, 142 B.R. 640, 642–43 (S.D.N.Y. 1992). The burden of proof as to any benefit is on the creditor. *Englewood*, 117 B.R. at 358; *CIS*, 142 B.R. at 642–43 (collecting cases). In the Seventh Circuit, a two-part test is applied for determining whether a debt should be awarded administrative priority. "[A] claim will be afforded priority under § 503 if the debt both (1) arises from a transaction with the debtor-in-possession and (2) is beneficial to the debtor-in-possession in the operation of the business." *In re Jartran, Inc.*, 732 F.2d 584, 586–87 (7th Cir. 1984).

▪▪▪ A debt which does not "arise" from a transaction with the debtor-in-possession may still be accorded administrative priority status if the creditor gave consideration to the debtor-in-possession. *United Trucking*, 851 F.2d at 161. "Consideration is furnished to the estate only where the debtor-in-possession induces post-petition performance or where performance on a contract not rejected by the debtor-in-possession is rendered to the estate." *Id.*

Thus, the key to the allowance of an administrative expense under this analysis is an inducement to a third party by a debtor-in-possession, followed by consideration from the third party to the debtor-in-possession. If the commitments of the parties arose prepetition, there is no administrative expense payable from the bankruptcy estate. *In re Cardinal Indus., Inc.*, 142 B.R. 801, 803–804 (Bankr.S.D.Ohio 1992). Here, the agreements were entered into pre-petition and no post-petition inducement by the debtor-in-possession was demonstrated in response to the motion.

▪▪▪ Still, there are occasions when damages from the post-petition continued use of leased property can bestow an administrative priority on a creditor even without additional inducement from the debtor-in-possession. *United Trucking*, 851 F.2d at 162. The purpose of according priority in such cases is to prevent unjust enrichment of the debtor's estate; it does not necessarily compensate the creditor for its loss. Thus, any administrative expenses, if appropriate here, should only reflect actual value conferred on the bankrupt estate by reason of the breach of the Restructuring Agreement. *Id.*

The breach in *United Trucking* was due to the debtor's failure there to maintain and repair equipment in accord with a lease obligation. That allowed the debtor a cash flow to continue its operations, and thus directly benefited the bankruptcy estate. On those facts, damages suffered by the owner of the leased equipment were properly accorded administrative priority.

Marriott, however, does not have an automatic administrative claim for $900,000 for each Leased Restaurant, even under the *United Trucking* analysis. Instead, Marriott would have to establish that Lunan's continued use of its Lease Restaurants provided some measurable, direct benefit to the bankruptcy estate.

Where a contract is assumed by a debtor-in-possession, damages which arise from a post-petition breach of that contract are "actual, necessary costs and expenses of preserving the estate." Thus, an administrative priority is properly awarded where liabilities under a contract are "necessarily incurred" so that the debtor might receive benefits of the assumed contract. *Matter of Kent Holland Die Casting & Plating, Inc.*, 125 B.R. 493, 503 (Bankr.W.D.Mich.1991); *see also In re Stewart Foods Inc.*, 64 F.3d 141, 145 (4th Cir.1995); *In re Hooker Investments, Inc.*, 145 B.R. 138, 145 (Bankr. S.D.N.Y.1992). Rejection of a lease constitutes a breach of that lease. Absent facts that establish an administrative claim, damages from that breach are merely treated as a general, unsecured, pre-petition claim. *Stewart Foods*, 64 F.3d at 144–45 (*citing* 11 U.S.C. §§ 365(g)(1), 502(g); *National Labor Relations Bd. v. Bildisco and Bildisco*, 465 U.S. 513, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984)).

As discussed, Marriott is not entitled to an administrative priority. However, even if it were, it would not come from sale proceeds of Leased Properties. Administrative claims only grant creditors a priority over other unsecured creditors, not over secured creditors. 11 U.S.C. § 507(a)(1); *see generally In re Lissner Corp.*, 119 B.R. 143 (N.D.Ill.1990). "[T]he Bankruptcy Code does permit such expenses incurred primarily for the benefit of the secured creditor's collateral to be reimbursed from the secured creditor's collateral, to the extent such expenses benefited the secured creditor." *In re Chicago Lutheran Hosp. Ass'n*, 75 B.R. 854, 857 (Bankr.N.D.Ill.1987). Marriott has not demonstrated on the record presented here such a benefit to BAI.

### The Issue of Whether the Leases were Bona Fide Leases (Counts I, II & III: Prayer (F))

Marriott also seeks a declaration that its Leases are bona fide leases in an attempt to invoke certain protections under § 365. *See* Amended Complaint ¶¶ 22–23. BAI argues that the Leases were not "true leases". Rather, they were entered into "as part of a restructuring, to provide Marriott with additional collateral security." BAI Memo at 18. Thus, BAI claims, Marriott is entitled to no benefits or protections under § 365(h) because the Leases are not "true Leases." *See In re Hardy*, 146 B.R. 206, 207 (Bankr.N.D.Ill.1992); *International Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 748 (2d Cir.1991); *In re Moreggia & Sons, Inc.*, 852 F.2d 1179, 1182 (9th Cir. 1988).

Labeling an agreement a "lease" does not make it one. Whether a "lease" is bona fide or merely a financing agreement depends upon the circumstances of each case.

> The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of title, the form of the transaction or the fact that the transaction is denominated as a "lease." The fact that the lessee, upon compliance with the terms of the lease, becomes or has the option to become the owner of the leased property for no additional consideration indicates that the transaction is a financing lease or lease intended as security. In such cases, the lessor has no substantial interest in the leased property at the expiration of the lease term. In addition, the fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease.

S.Rep. No. 989, 95th Cong., 2d Sess. 64 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5850 quoted in *In re KAR Dev. Assocs., L.P.*, 180 B.R. 629, 635 n. 8 (D.Kan.1995); *see also International Trade*, 936 F.2d 744; *Moreggia*, 852 F.2d 1179; *Matter of Tak Broadcasting Corp.*, 137 B.R. 728, 732 (W.D.Wis. 1992). A "lease" is not a bona fide lease when it imposes obligations and confers rights significantly different from those arising out of the ordinary landlord/tenant relationship. *In re PCH Assocs*, 804 F.2d 193, 200 (2d Cir.1986). There is a rebuttable presumption, however, that what is labeled or denominated a lease is in fact a bona fide lease absent compelling factors to the con-

trary. *Id.* Thus, the burden of proving whether or not the lease is bona fide rests with BAI. BAI met its burden on this issue.

The general test for determining whether a lease is bona fide is commonly called the economic substance test and is based upon the above, oft quoted, Senate report. *KAR,* 180 B.R. at 629. Under this test, it seems clear that the lease and sublease of the Leased Restaurants were not "leases" after all. Lunan agreed to lease the Leased Restaurants to Marriott at a rate of $1.00 per year per restaurant for 20 years with two five-year renewal periods. Restructuring Agreement § 2.13.1. This obviously nominal rent was not calculated to compensate Lunan for the use of the Leased Restaurants, nor was it in any manner otherwise related to the value of the properties involved. Marriott agreed to lease the same restaurants back to Lunan for a total of $6,460,000 during the 20–year period and an additional $5 million during the ten-year renewal period. *Id.* at § 2.13.2. Further, at such time as Lunan pays its debt to BAI in full, Marriott can purchase the Leased Restaurants for $10.00 per restaurant. *Id.* at § 2.13.4. Marriott's option, at the end, to purchase the leased property for obviously nominal consideration is strong support for the argument that the transaction was one for financing rather than a bona fide lease. There is additional evidence as well. Lunan was responsible for all utilities, obligated itself to pay all taxes and insurance, and in some situations was responsible for repairs from fire or casualty damage above and beyond the extent of insurance coverage. Lease at ¶ 28; Sublease Agreement at ¶ 15(D). These factors are strong indicia of ownership and do not demonstrate a typical landlord/tenant relationship. *PCH,* 804 F.2d at 201.

In addition, the Restructuring Agreement states that the lease and new sublease were being entered into in partial satisfaction of projected losses due to the return of six restaurants from Lunan to Marriott. Restructuring Agreement at § 2.12. Marriott's

vice president states that the "lease" provisions were included in the Restructuring Agreement "in an effort to (i) recoup in the future a portion of the $8.5 million owed by Lunan to Marriott which Marriott was forgiving under the terms of the Restructuring Agreement, and (ii) cover some of the massive losses which Marriott expected to incur as a result of Lunan's return of six of the former Wag's properties...." Jennings Affidavit at ¶ 6.

Based on all evidence presented and viewing all reasonable inferences in favor of the nonmoving party, the "leases" in question are found to be financing arrangements and not true leases. Thus, BAI's motion is allowed as to the issue of the nature of the leases.[13]

For reasons stated above, BAI's Motion for Summary Judgment as to Marriott's Adversary Complaint will be granted.

### *BAI's Counterclaim and Cross-claim*

BAI also seeks summary judgment on its Counterclaim and Cross-claim. For reasons discussed below, this request is granted. In Count I, BAI seeks a declaration that its security interests and liens are valid and prior to Marriott's interests in the Leased Restaurants up to the amount of the debt owed by Lunan to BAI. BAI also asks that the net proceeds of the restaurant sales be distributed to BAI until Lunan's debt to BAI has been satisfied in full. The earlier discussion relating to Marriott's Complaint determines the outcome here as well.

As stated, BAI has a valid prior interest in the Leased Restaurants and the proceeds from the sales thereof. This has been well-established pursuant to clear and unambiguous terms of the Restructuring and Subordination Agreements. There is nothing in the record to establish any rights in Marriott to prevent BAI from receiving proceeds from sales of Leased Restaurants. BAI has the superior interest, and the proceeds from the sales in question are substantially less than BAI's allowed claim.

---

**13.** However, as Marriott asserts, the issue of whether the leases were "bona fide" "has no bearing on the issue of whether or not the terms of the Restructuring Agreement was breached." Marriott Response at p. 11. It is likewise irrele-vant to the determination of the validity and priority of liens and distributions from proceeds of sale. The nature of the leases goes to Marriott's bankruptcy claim against Lunan and not to any alleged claim vis a vis BAI.

Marriott has not demonstrated that it is entitled to any proceeds from sale. Not only has Marriott failed to demonstrate that it is entitled to an administrative priority, it has established no grounds for paying any purported claim against the estate out of a secured creditor's asset. Thus, summary judgment is appropriate in favor of BAI as to Count I of its counterclaim and cross-claim.

In Count II, BAI requests an order declaring that § 2.13.7 of the Restructuring Agreement does not apply to Lunan's sale in the context of a bankruptcy proceeding. In the alternative, it seeks declaration that it is junior and subordinate to BAI's security interest. The earlier discussion of Marriott's Complaint again control this issue. The § 2.13.7 Buy-out Provision works in conjunction with the Bank Agreement and compensates Marriott for early termination of its leases. The Buy-out Provision is only applicable if certain conditions are met. As stated, the conditions for enforcement of the Buy-out Provision have not been met as to any of the Leased Restaurants. While it is true that Marriott may have a claim against Lunan for breach of the Restructuring Agreement, it would be junior and subordinate to BAI's secured claim. Thus, summary judgment will be granted in favor of BAI on Count II of its Cross-claim and Counterclaim.

### CONCLUSION

Summary judgment is appropriate here because there is no material issue of fact in dispute and the movant is entitled to judgment as a matter of law. Thus, for the foregoing reasons and by separate order, BAI's Motion for Summary Judgment will be granted in its entirety. As such, judgment will be separately entered declaring that BAI's liens and security interests in the Leased Restaurants are valid and prior to Marriott's interests in the Leased Restaurants up to the amount of the debt owed by Lunan to BAI; that any claim Marriott has arising out of § 2.13.7 of the Restructuring Agreement or a breach thereof is junior and subordinate to BAI's security interest in the Leased Restaurants; and that the net proceeds available from sales of the Leased Res-

taurants will be distributed to BAI until Lunan's debt owed to BAI has been satisfied in full. Proposed draft judgment in accord with the foregoing will be submitted by BAI's counsel on a date set by separate order.